### ROBERT E. RIFFEY et al. v. CESAR L. TONDER et al.

[No. 788, September Term, 1976.]

*Decided July 7, 1977.*

The cause was argued before MENCHINE, MOORE and LISS, JJ.

*Ronald M. Sharrow,* with whom were *Alfred S. Julien, Stuart A. Schlessinger* and *Lonn E. Berney* on the brief, for appellants.

John F. King, with whom were *E. Dale Adkins, III,* and *Anderson, Coe & King* on the brief, for appellee Cesar L. Tonder. *Wilbur D. Preston, Jr.,* with whom was *M. Natalie McSherry* on the brief, for appellee South Baltimore General Hospital.

MOORE, J., delivered the opinion of the Court.

The surviving husband of a young mother who died of a pulmonary embolism instituted this medical malpractice

action against her obstetrician, Cesar L. Tonder, M.D. and the South Baltimore General Hospital, appellees. Suit was brought by the husband individually, in his capacity as administrator, and as father and natural guardian of the couple's two infant children. After an 11-day jury trial, there was a verdict for the defendants-appellees. On this appeal, the principal assignment of error is a ruling of the trial court which precluded the appellants from producing a pathologist as a rebuttal witness. Errors in the court's charge to the jury are also claimed. We find reversible error in the holding by the trial court that the testimony of the pathologist would not have constituted rebuttal evidence.

I

On October 23, 1970, Wanda Riffey delivered a child by caesarean section at the South Baltimore General Hospital. Her physician, Dr. Cesar L. Tonder, a specialist in obstetrics and gynecology, was Associate Director of the Department of Obstetrics and Gynecology at the Hospital. The medical records introduced into evidence revealed that Mrs. Riffey was a private patient of Dr. Tonder. She was discharged on October 26, 1970.

A persistent swelling of her right calf forced Mrs. Riffey to seek medical assistance in the emergency room of the Hospital on November 7, 1970. One of the Hospital's interns, Dr. Yu, examined her at that time and diagnosed her condition as acute thrombophlebitis (the formation of a blood clot caused by inflammation of the vein). She was admitted under the care of Dr. Tonder. The latter saw the patient on the evening of the 7th and, concurring with Dr. Yu's diagnosis, ordered administration of the drug dextran. One of the facts elicited from Mrs. Riffey upon admission was that the leg pain associated with the swelling had persisted for about one week. On November 10, she was seen in consultation by Dr. Colen Heinritz, an internist with privileges at the Hospital. He examined her, made a diagnosis of thrombophlebitis resolving in the right leg, and reordered another unit of dextran. Twice the following day,

in a follow-up consultation, Dr. Kermit Bonovich, Dr. Heinritz's partner, visited the patient.

The medical records disclose that on November 12 the patient experienced chest pains, of which she complained to the nurse, in the upper left lung and at the base of the neck. One of the Hospital's interns, Dr. Matesic, was notified and he ordered chest x-rays (which were negative) and recorded her vital signs. Additionally, she was examined the same day by Dr. Bonovich, who noted that she was responding well to the dextran and that she was ambulatory.

Mrs. Riffey was discharged from the Hospital on November 14 at 9:15 a.m. According to her discharge records, she was asymptomatic, swelling and pain having been relieved. Shortly after her release, however, while at home, she collapsed and was rushed to the emergency room of Bon Secours Hospital. There she succumbed to a massive pulmonary embolism at 11:45 a.m.

Dr. William D. Roche, a specialist in obstetrics and gynecology at Navy Regional Medical Center in San Diego, California, qualified as appellants' sole expert witness. In his opinion, both Dr. Tonder and the Hospital breached the appropriate standard of care required of physicians and hospitals in the same class as the appellees, acting under similar circumstances, by failing to diagnose Mrs. Riffey's symptoms on November 12, the day of her chest complaints, as a minor pulmonary embolism, and by failing thereafter to treat her properly with an anticoagulant drug, specifically heparin. Dr. Roche testified that where an overweight,[1] post-operative patient, suffering from thrombophlebitis complains of chest pains, a diagnosis of a pulmonary embolus is indicated "until otherwise proven." [2]

---

1. Mrs. Riffey's weight was 220 lbs. She was five feet, five inches tall and 21 years of age.

2. The critical importance or danger of thrombophlebitis, according to Dr. Roche, is the possibility that it will lead to the more serious pulmonary embolism. A pulmonary embolus is formed when the blood clot, thrombo, breaks free of the vein and enters the bloodstream as an embolus. A thromboembolus in the venous bloodstream travels to the heart and then to the lungs through the pulmonary arteries. Depending upon the size of the embolus, the condition may be fatal.

Testifying from the medical records admitted in evidence, Dr. Roche concluded that certain diagnostic tests should have been performed to ascertain the existence *vel non* of an embolus on November 12. These tests should have included additional x-rays, enzyme, bilirubin and blood gas tests, a lung scan and electrocardiograms. The physician relied upon the recorded vital signs, measured on the day of Mrs. Riffey's chest complaints, indicating elevated pulse (110 per minute) and increased respiratory rate (from 20 to 28) to corroborate his conclusions that the patient suffered from a minor pulmonary embolism on November 12. By administering the drug heparin, according to Dr. Roche, Mrs. Riffey's blood would not have coagulated, or clotted, to any further degree thereby avoiding the possibility of a *second,* more serious pulmonary embolus; "my opinion is unequivocally that failure to treat this first pulmonary embolus directly led to her death," he flatly declared.

In their defense, the appellees produced, in addition to the treating physicians, Dr. Tonder, Dr. Bonovich and Dr. Heinritz, three other medical expert witnesses, unconnected with the treatment of Mrs. Riffey. Each of the witnesses testified that based on the medical records and the autopsy report, Mrs. Riffey did not experience a minor pulmonary embolism on November 12. According to Dr. C. Thomas Flotte, associate professor of surgery at the University of Maryland Medical School, the signs and symptoms of a pulmonary embolism, including sharp, crushing pain in the chest, as opposed to the tenderness noted in Mrs. Riffey's case, respiratory distress and elevated pulse, were not indicated on the 12th. Also, both Dr. Flotte and Dr. Umberto Villa Santa, professor of medicine at the University of Maryland, stated that the use of dextran was in keeping with the standard of care in treating thrombophlebitis.[3]

3. Heparin, according to appellees' experts, works on the clotting process in order to prevent coagulation; dextran coats the walls of the vein with an opposite electrical charge to that of the blood platelets, thereby repulsing the particles and preventing stasis (pooling of the blood). Although the effect of the two drugs is very similar, in preventing further blood clotting, appellees' experts stated at trial that one of the known contraindications of heparin is the fact that it promotes bleeding, by interfering with the

## II The Rebuttal Witness

Of critical importance to appellants' case was evidence that Mrs. Riffey had in fact suffered a minor pulmonary embolism on November 12. Dr. Roche, in stating his conclusion as to the existence of a pulmonary embolism on November 12, relied primarily upon the Hospital's medical records of that day. Although appellants' counsel did inquire of the witness whether he had reviewed the autopsy report, to which Dr. Roche affirmatively responded, it is clear from the record that the doctor used the autopsy report for a limited purpose. The following appears in the transcript:

"Q. (Mr. Julian [appellants' counsel]) Doctor, have you, and I will request also that you look at the autopsy report in the case of Mrs. Riffey?

A. Yes, I have.

Q. Do you have a copy of it, doctor?

A. Yes, I have a copy.

Q. First, with respect to her general state of health, her vital organs, heart, liver, spleen, those things, what does it show with respect to this woman?

A. She was an extremely healthy young woman.

Q. And insofar as the hospital record and the autopsy is concerned, did she reveal any kind of a bleeding problem?

A. None whatsoever."

On cross-examination, although appellees elicited from Dr. Roche the fact that he considered the autopsy in formulating his opinion as to the deceased's condition on November 12, the substance of the examination, with regard to the autopsy report, concerned only the witness' assertion on direct that there were no indications of a bleeding problem.[4]

clotting process. In Mrs. Riffey's case, they stated, the use of heparin would not have been proper due to her post-operative condition and the fact that her surgical wounds had not yet healed.

4. As previously noted, appellees' expert witnesses testified that one of the known contraindications of heparin is its propensity to promote

The appellees' experts, however, used the autopsy report quite extensively in their direct examination to rebut Dr. Roche's testimony that Mrs. Riffey suffered a pulmonary embolism on the 12th, and that certain diagnostic tests would have revealed this condition. Dr. Flotte was questioned as follows:

"Q. (By Mr. King [counsel for appellee Tonder]) Now, doctor, have you an opinion, with reasonable medical certainty, *considering Mrs. Riffey's chart and as well as her autopsy findings on autopsy* [sic], *have you an opinion, with reasonable medical certainty, whether or not on the 12th Mrs. Riffey did have a pulmonary embolus or pulmonary emboli?*

A. *There is nothing to suggest that she did.* The findings don't mention anything that would suggest a prior pulmonary embolus.

Q. When you say, the findings don't suggest anything which would — what was your answer, sir?

A. When you have a pulmonary embolus, normally you have loss of blood supply to a wedge of tissue in the lung and normally forty-eight hours after this, *it should be easily picked up at autopsy, and they don't mention it. They say, the lungs are smooth and glistening, and so forth.*[5]

Q. *Doctor, have you had occasion in the past to examine pathology and pathological reports in patients with pulmonary emboli?*

A. Yes.

Q. What's been your experience in that respect?

A. Unfortunately for most of them, similar to this, there is a massive fatal pulmonary embolus

bleeding. Dr. Roche's testimony, above quoted, was apparently intended to negate any evidence that Mrs. Riffey was particularly vulnerable to bleeding.

5. The medical examiner's autopsy report stated, "The pleural surfaces are smooth and glistening through."

that causes death in a matter of minutes or within an hour.

Q. Where — go ahead, sir.

A. In lesser ones — and, of course, most of them don't die, — it is only a coincidental finding and most often we didn't know they had a pulmonary embolus, and we do find this wedge-shaped infarction.

Q. Did Mrs. Riffey have any such wedge-shaped infarction?

A. *It is not reported in the autopsy.*"

Similarly, with regard to the issue of what the autopsy report reveals as to Mrs. Riffey's condition on November 12th, appellees' expert, Dr. Villa Santa, testified as follows:

"Q. *Have you an opinion, considering the autopsy of Mrs. Riffey, have you an opinion, with* reasonable medical certainty, that if a lung scan or serial x-rays had been done, whether or not, in view of her findings on autospy, whether or not they would have been diagnostic of pulmonary emboli on the 12th?

A. Could I use the blackboard?

Q. Yes.

A. If we can just draw roughly the lungs in a patient, then, you know, this is the neck and the face is here, and these are the shoulders. This is the diaphram and the belly button is down here. The lungs look like two big sacks and there is blood coming to the lungs, coming from the area here called the iris of the lung, and blood comes through the arteries, as you all know, and then leaves the lung through veins. And when you have an embolism, what happens, there is a clot, something that stops the flow of blood to this arterial tree. . . . So, what happens, all this blood just comes back and what happens in this area that is aerated by this artery, there is a tremendous congestion.

because all this blood comes back. That is what we call an infarction, and this thing usually has a triangular configuration and it goes all the way to the surface of the lung, where we have a lining that we call the pleura, and this is an infarction. If the patient survives and the patient lives through it, it takes roughly a minimum of eight days, approximately ten days before this blood is eventually absorbed and you don't see it anymore. *On anybody who has had an infarction and in whom, you know the life stops two days later, if you do a post mortem examination of the lungs, you should first find [these] changes.*

Q. Were there any such changes found in Mrs. Riffey?

A. *On the autopsy there is absolutely no indication that there was any infarction* because, the first thing, the description of the pleura, which is the lining here, is of being normal. [sic] Usually if you have an infarction, this becomes bluish — redish-bluish — is due to the fact that the blood — it is just like when you have a bruise. The skin is light and it gets dark. And so, the pleura should have been dark, and in cutting the lung, they should have found that and there was no evidence that an infarction was there." (Emphasis added.)

Our study of the record discloses that each of appellees' expert witnesses relied upon the autopsy report's findings to contradict Dr. Roche's testimony that other diagnostic tests, in addition to the lung scan or serial x-rays about which Dr. Villa Santa testified, would have disclosed the presence of a minor embolus on the 12th of November.

It is clear from the record that the testimony of Dr. Villa Santa, a nonpathologist, impelled appellants' counsel to secure the testimony of a qualified pathologist as a rebuttal witness. (Indeed, counsel for appellants stated on the record that until the testimony of Dr. Villa Santa he had never conferred with a pathologist in this case.) In essence, Dr.

Villa Santa testified that there could not have been a small embolus on November 12th and, as shown by his testimony, above quoted, he drew a diagram and demonstrated from the autopsy report that had there been a small embolus pre-existing, the configuration which he placed in the diagram would have occurred. This, trial counsel argued to the trial court, was a pathological question. In addition, counsel maintained that Dr. Villa Santa's opinion that, with the massive embolus shown in the diagram, any effort to rescue the decedent would have been unavailing, also involved a pathological question.

Accordingly, counsel informed the court after a recess following the testimony of Dr. Villa Santa, that he had conferred with Dr. Michael Baden, Assistant Chief Medical Examiner of New York City, and had informed counsel for the appellees, by appropriate amendment to answers to interrogatories, of his intention to call Dr. Baden as a rebuttal witness. In response to objections from counsel for the appellees that the testimony of Dr. Baden would be nothing more than cumulative to the testimony of Dr. Roche, appellants' trial counsel advised the court that "I am not using this doctor to make out my case." He then went on to explain:

> "I did not anticipate through Roche the kind of testimony that Villa Santa would give and I think it is absolutely improper and I think in the interest of justice, it's important that a jury really know what an autopsy report is about, and whether in fact it does indicate that no life saving measure could be employed for this woman or whether, indeed, it is of such condition that it proscribes any thought of a pre-existing small emboli."

When called upon by the court for a formal proffer concerning Dr. Baden's testimony, trial counsel replied as follows:

> "Dr. Baden's testimony will be, A, *that this autopsy report does not indicate that there was not a pre-existing small emboli to the massive emboli*

*found. He will testify that autopsy reports are for the purpose of ascertaining cause of death and not for peripheral questions such as that posed by counsel. 'Does a massive embolus in this case necessarily mean that there could not have been a pre-existing small embolus?'* He will testify that Dr. Villa Santa's exhibit — the number escapes me, Judge, — the diagram which he drew is not at all in keeping with pathological doctrines and, actually, does not disclose the condition which a patient with an embolus would have. I'm not just using him, Your Honor, — I am not attempting to use him to establish anything with respect to the use of Heparin.

(The Court) I understand.

(Mr. Julien) The use of Dextran, nothing with respect to my prima facie case." (Emphasis added.)

At the conclusion of this colloquy, the trial judge observed, *"I am inclined to believe that the subject matter is an appropriate one for rebuttal testimony."* (Emphasis added.) But he observed also that the element of appellees' inability to depose Dr. Baden presented a problem. Over appellant's counsel's protestations that counsel for the Hospital and the doctors had theretofore taken no depositions whatever in the case, the court ruled that appellants' counsel would be permitted to call Dr. Baden provided he was produced that afternoon or the next afternoon, in Baltimore, for purposes of deposition.

Subsequently it developed that Dr. Baden could not be deposed within the time schedule set by the court for the reason that he was engaged in a 2-day examination for the position of Chief Medical Examiner for the City of New York, and counsel sought additional time to meet the requirement that the witness be deposed. Counsel again assured the court that he was offering Dr. Baden to meet "what is now the major contention of the defense, *to wit,* that because the autopsy report shows no evidence of infarction, there could not have been any previous small

emboli prior to November 14th." Counsel supported his plea for additional time with the following statement:

> "But I respectfully submit, sir, *that they have tendered a very basic issue here which I never anticipated. Had I anticipated it, I would have fully examined Dr. Roche, who is no longer available and who is in California at this point.* This morning, because counsel for Dr. Tonder insisted that there had been examination of Dr. Roche on the subject of the autopsy report and did he rely upon it in arriving at his decision and, specifically, the fact that there was smooth and glistening pleura and what its affect was, we spent perhaps as much as an hour going over the minutes, all of which refuted completely the contention made by Mr. King. In effect, nothing had been said on the subject by that witness." (Emphasis added.)

Extended argument ensued in which counsel for the appellees renewed their positions that the testimony of Dr. Baden would be merely cumulative to that of Dr. Roche.

At the conclusion of the respective arguments, the trial court recited the sequence of events which had taken place and observed that the inability to present Dr. Baden for deposition within the time specified "has now caused a complete re-examination of the question as to whether Dr. Baden's testimony would in fact be rebuttal testimony." The court then reconsidered and concluded that Dr. Baden's testimony would not constitute rebuttal, stating:

> "The court feels that, based on the evidence as produced, the issue of a minor nonfatal pulmonary embolism, which occurred at sometime before the pulmonary embolism, was clearly raised by the plaintiff, was clearly a part of the plaintiffs' expert witness, Dr. Roche. What was not touched upon by the expert, Dr. Roche, was the precise reason that may or may not have been in the autopsy report, which supported or contradicted his opinion. His

opinion was rendered and he supported his opinion. When defense experts were called, they pointed to something in the autopsy report which they felt contradicted Dr. Roche's opinion.

"Now, all you are asking to do is to have another expert explain Dr. Roche's opinion by re-examination of the autopsy report, to say that his examination of the autopsy report somehow confirms Dr. Roche's opinion, although Dr. Roche didn't see fit to confirm his own or support his own opinion by reference to the autopsy report in this detail. He was asked, I think, by both counsel as to what documents he had examined before rendering his opinion. I think, while he was on the witness stand, the autopsy report was offered in evidence by plaintiffs counsel. At the outset of his cross-examination, he was asked whether he had considered the South Baltimore General Hospital Record, the Bon Secours Record, and the autopsy report in the formation of his opinion and he answered affirmatively.

"*Consequently, at this point I do not believe that it is rebuttal testimony.* I believe it would be cumulative testimony to attempt to supply a reason for Dr. Roche's opinion, which Dr. Roche for some reason did not supply himself. So the objection to the production of Dr. Baden is sustained." (Emphasis added.)

Basically, rebuttal evidence is any competent evidence which explains, is a direct reply to or a contradiction of material evidence introduced by an accused in a criminal case. or by a party in a civil action. *State v. Hepple,* 279 Md. 265, 270, 368 A. 2d 445 (1977), *aff'g, Hepple v. State,* 31 Md. App. 525, 358 A. 2d 283 (1976); *Mayson v. State,* 238 Md. 283, 289, 208 A. 2d 599, 602 (1965); *Lane v. State,* 226 Md. 81, 90, 172 A. 2d 400, 404 (1961), *cert. denied,* 368 U. S. 993 (1962); 6 Wigmore on Evidence § 1873 (Chadbourn rev. 1976).

It is also well settled that whether evidence is properly

rebuttal is a matter for the exercise of judicial discretion. In Maryland, an appellate court will not reverse for error in this determination unless the ruling of the trial court was both "manifestly wrong" and "substantially injurious." *Hepple v. State, supra*, 31 Md. App. at 532, 358 A. 2d at 288.

In our opinion, the instant case involves not an attempt by appellants to adduce evidence in rebuttal which properly should have been elicited in their case in chief, or merely cumulative evidence, as the trial judge suggested but, rather, an effort to produce evidence which truly tended to answer and contradict the testimony offered during appellees' presentation of the defense. Appellees' expert witnesses testified, as has been explained here in some detail, that the findings contained in the autopsy report could properly be used to support the conclusion that there was no evidence present, at the time of death, that Mrs. Riffey had suffered a pulmonary embolism on November 12th. Although it was critical to appellants' case that they produce evidence that the deceased did experience such an embolism on the 12th, and they did so by the testimony supplied by Dr. Roche *based principally on his review of the medical records of November 12*, it was not incumbent upon them to anticipate that appellees would rely upon the autopsy report to negate the presence of a pre-existent embolus or else be foreclosed from responding to such an assault upon their proof. Dr. Baden's testimony, according to the appellants' proffer, was to be restricted to whether the protocol of an autopsy would concern itself with such secondary questions as whether an infarction existed in the lining of the lungs or whether the autopsy would be limited primarily to the cause of death. If, according to the proffer, an autopsy would not be concerned with a medical condition which was not a contributing cause of death, then the testimony of appellees' experts would have been contradicted not only concerning Mrs. Riffey's condition on November 12th, but also as to whether certain diagnostic tests would have been constructive in diagnosing her condition.

We accordingly find that the trial court's ruling that Dr.

Baden's testimony would not constitute rebuttal was "manifestly wrong." Additionally, we conclude such error was "substantially injurious" to the rights of the appellants. If Dr. Baden had testified consistently with the proffer, there would have been evidence before the jury which, if believed, would have seriously undermined the conclusions of appellees' experts that Mrs. Riffey did not have a pulmonary embolism on November 12. Since this issue was so crucial to appellants' case, we find reversible error.

## III Trial Court's Instructions

Appellants also assert on appeal various alleged errors in the court's charge to the jury, including refusal to give certain requested instructions, and alleged prejudicial comments made by counsel for the appellee, Dr. Tonder, in his summation. Because of the nature of the alleged errors, and our disposition of the appeal, we shall discuss only those points which may be relevant on retrial.

### A. *Alleged Erroneous Instructions*

(1) The trial court instructed the jury that the appellants bore the burden of proof on the issue of negligence by a preponderance of the evidence. In explaining the appellants' burden, the court stated:

"To prove something by the preponderance of the evidence means to prove it by the greater weight of the evidence. It means to prove that something is more likely true than not true. In other words, greater weight of the evidence means such evidence as when considered and compared with that opposed to it has more convincing force and produces in your minds a belief that what the plaintiff is seeking to prove is more likely true than not true."

Also, the trial judge discussed the standard upon which the jury should evaluate the appellees' conduct as being: "That degree of care and skill which is expected of a reasonably competent physician [and hospital] in the same

class to which he belongs, acting in the same or similar circumstances."

Subsequently, the trial judge declared:

"You are instructed that the law *presumes*, in the absence of evidence to the contrary, that a physician and a hospital has [sic] performed their respective duties with the required degree of care and skill. So that the plaintiffs must prove by the greater weight of the evidence that the defendants failed to exercise such care and skill as was required." (Emphasis added.)

It is appellants' contention that by instructing the jury that the appellees were "presumed," in the absence of evidence to the contrary, to have performed their duties within the appropriate standard of care, that an unfair burden was placed upon their shoulders. Viewed within the entire context of the trial judge's instructions, we conclude that the jury was properly instructed that the burden of the appellants was to prove negligence by a preponderance of the evidence, and that no greater duty was placed upon them. However, we do find troublesome the continued use of the language that a defendant-physician, in a medical malpractice action, is "presumed" to have performed within the appropriate standard of care, as defined in *Shilkret v. Annapolis Emergency Hospital Association*, 276 Md. 187, 349 A. 2d 245 (1975) unless otherwise proved.

The use of the word "presumption", in the context of medical malpractice suits, first appeared in *State, use of Janney v. Housekeeper*, 70 Md. 162, 171, 16 A. 382 (1889), where Judge Yellott wrote:

"It was the duty of the professional men to exercise ordinary care and skill, and this being a duty imposed by law, it will be presumed that the operation was carefully and skillfully performed in the absence of proof to the contrary. *As all persons are presumed to have duly performed any duty imposed by them, negligence cannot be presumed,*

*but must be affirmatively proved." See, e.g., Nolan
v. Dillon,* 261 Md. 516, 534, 276 A. 2d 36, 46 (1971);
*Johns Hopkins Hospital v. Genda,* 255 Md. 616, 621,
258 A. 2d 595 (1969); *Lane v. Calvert,* 215 Md. 457,
462, 138 A. 2d 902 (1958); *Fink v. Steele,* 166 Md.
354, 360, 171 A. 49 (1934). (Emphasis added.)

In *Evans v. State,* 28 Md. App. 640, 349 A. 2d 300 (1975),
*aff'd,* 278 Md. 197, 362 A. 2d 629 (1976), Judge Moylan, in
cataloguing the numerous problems associated with the use
of the word "presumption," wrote: "to avoid future
confusion, ["presume"] should be restricted to its technically
proper role of describing a *shifting* of a burden." 28 Md. App.
at 681, 349 A. 2d at 327. *Accord,* McCormick on Evidence
§ 342 (2d ed. 1972). McCormick similarly treats the proper
use of the term "presumption" as denoting the use of a
procedural standardized device whereby, upon proof of fact
B, the trier of facts may infer proof of fact A, thereby
shifting the burden of producing evidence (and, in certain
cases, shift the burden of persuasion as well) to the opposing
party on that issue. *Id.* at § 342.

Although Judge Moylan in *Evans* concluded that for the
sake of clarity the technical use of "presumption" should be
restricted to those cases involving a shifting of the burden,
he noted that the term has been used with five distinct
connotations.[6] Our examination of the relevant case law

---

6. Judge Moylan wrote:

"['Presumption'] connotes five very different things:

1) a mere statement as to who has and what is the burden of
persuasion (*e.g.,* the presumption of innocence);

2) a rule of substantive law (a conclusive presumption);

3) a permitted inference of fact (*e.g.,* the so-called "pre-
sumption" that the possessor of recently stolen goods is
the thief;

4) a presumption of law, or true presumption, in the Morgan
tradition of shifting the burden of ultimate persuasion and
entailing either a directed verdict or a jury instruction; and

5) a presumption of law, or true presumption, in the
Thayer-Wigmore tradition of something which shifts only
the burden of going forward with evidence and which totally
dissipates or disappears from the case once that burden is
met (the "bursting bubble" concept)." *Evans, supra,* 28 Md.
App. at 676-77; 349 A. 2d at 324-25.

discloses that the term "presumption," in the context of medical malpractice actions, is used merely as a shorthand statement of assigning the burden of proof in such cases, and does not involve a "shifting" of the burden. Since "the general principles which ordinarily govern in negligence cases also apply in medical malpractice claims," *Shilkret, supra,* 276 Md. at 190, 349 A. 2d at 247, a statement that physicians are "presumed" to have acted within the appropriate standard of care cannot operate to shift the burden of proof to the plaintiff since that party already has the burden under the ordinary rules governing negligence actions. As "the vocabulary is rich enough to find words to describe this . . . burden [of proof] upon the [plaintiff] without resorting to a misuse of that procedural word of art 'presume'," *Evans, supra,* 28 Md. App. at 681, 349 A. 2d at 327, we eschew the continued use of the term in describing the burden of proof in medical malpractice actions. As previously stated, however, we find no error here in the light of the totality of the court's instructions with respect to the burden of proof.

(2) Appellants also contend that the trial court erred in charging the jury that:

> "In the treatment of patients, physicians are not held liable for an error in a diagnosis if that diagnosis was reasonably and prudently arrived at. Physicians are permitted to exercise a wide range of discretion in the exercise of their medical skill and judgment. A physician is not to be held liable for negligence unless it is shown that the course pursued by him was not recognized as medically acceptable in the medical profession under the same or similar circumstances."

It is asserted that "while judgment has always been held to be a defense in malpractice causes, it must be judgment which is arrived at through the use of all modalities available, and only after the most careful and precise evaluation." We construe appellants' contention as attacking the trial court's charge with respect to the applicable

standard of care to which the appellees were bound in diagnosing Mrs. Riffey's condition.

In determining whether the appellees' diagnosis was "reasonably and prudently arrived at," the jury was bound by the trial court's earlier instruction that:

> "a physician is under a duty to use that degree of care and skill which is expected of a reasonably competent  physician in the same class to which he belongs, acting in the same or similar circumstances."

This instruction was clearly proper as within the guidelines enunciated in *Shilkret v. Annapolis Emergency Hospital Association, supra.* Under these circumstances, we find no error. *See generally* 70 C.J.S. Physicians and Surgeons § 48 (1951); *Marlow v. Cerino,* 19 Md. App. 619, 630-32, 313 A. 2d 505, 511-13 (1974).

(3) In the course of the trial court's charge to the jury, the court stated that the testimony of appellants' expert was "diametrically opposed" to that of the experts produced by the appellees. Appellants contend that this statement compelled the jury to weigh the *number* of witnesses for both sides in resolving credibility. Any such impression created in the minds of the jury was certainly dispelled by the court's further instruction that:

> "The weight of the evidence is not measured by the number of witnesses nor by any particular circumstances, but rather by the inherent believability, probability and persuasion of all of the evidence."

We find no error.

B. *Failure to Give Requested Instructions*

(1) At the end of the court's charge, appellants' counsel made several requests for additional instructions.[7] One such

---

7. Appellees on appeal contend that any alleged error in failing to give these additional instructions is not properly preserved for our review because of the appellants' failure to comply with Maryland Rule 554 a. The

instruction requested by the appellants, relating to the appellees' use of dextran in treating Mrs. Riffey in contrast to the testimony of Dr. Roche that heparin was the drug of choice, was as follows:

> "Where a drug manufacturer recommends to the medical profession the conditions under which drugs can be prescribed, the disorders it is designed to relieve, the precautionary measures which should be observed, that the doctor's deviation from some recommendations may be considered by them as some evidence of negligence."

In *Nolan v. Dillon, supra,* the Court of Appeals considered, in the context of a medical malpractice suit, whether there was error in the trial court's charge that the jury could consider as evidence of negligence the defendant-physician's failure to observe the manufacturer's warnings contained in the package insert accompanying each drug. In holding that the court's instruction was proper, Judge Singley noted that, "there was ample testimony that a failure to observe the manufacturer's warnings did not conform to the standards of practice in the field of obstetrics in Montgomery County." 261 Md. at 540, 276 A. 2d at 49.

The only evidence adduced on this subject in the case *sub judice* was the testimony of Dr. Tonder. Called as an adverse witness in appellants' case, Dr. Tonder conceded that the manufacturer's insert and the Physicians Desk Reference, which contains substantially the same information, do not indicate the use of dextran in the treatment of thrombophlebitis. However, in the absence of testimony from either Dr. Tonder or any other medical expert to the effect that the manufacturer's instructions contained on the package insert or in the Desk Reference establish a standard of care to which physicians of Dr. Tonder's class, acting

---

Rule provides that proposed instructions be given to the trial court "at the close of the evidence or at such earlier time. . . ." Our review of the record fails to disclose at what stage in the proceedings appellants proposed their "additional instructions." We therefore are unable to evaluate appellees' contention and we will consider the substance of the additional instructions requested.

upon the same or similar circumstances, are bound, we hold that the trial court properly denied appellants' instruction.

(2) Finally, appellants challenge the trial court's failure to give a requested instruction declaring that since Dr. Tonder held himself out as a specialist in the field of obstetrics and gynecology, he was held to that degree of skill and knowledge ordinarily possessed by similar specialists.

As previously quoted, the trial court properly instructed the jury on the standard of care, as articulated in *Shilkret*, *supra*, to which the appellees were bound in performance of their duties. In formulating a standard in which the defendants' conduct is to be measured against that of other "reasonably competent practitioner[s] in the *same class* to which he belongs, acting in the same or similar circumstances," (emphasis added), 276 Md. at 200, 349 A. 2d at 253, the Court in *Shilkret* specifically stated, "[T]here is no valid basis for distinguishing between general practitioners and specialists in applying standards of care." *Id.* at 199, 349 A. 2d at 252. Judge Levine, speaking for the Court, noted that the standard as formulated took into account the fact of specialization or general practice. The trial court's instruction in the instant appeal followed the rule mandated in *Shilkret* and, therefore, appellants' request for an additional charge was properly rejected. *See Aronstamn v. Coffey*, 259 Md. 47, 267 A. 2d 741 (1970).

> *Judgment reversed; case remanded for a new trial; costs to be paid by appellees.*