508 A.2d 522

**Jody Ann HETRICK, et al.**

v.

**Stanley R. WEIMER, et al.**

**No. 1090, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

May 14, 1986.

524

**526**

Gilbert H. Robinette (Henry E. Dugan, Jr. and Robinette, Dugan, Seiden & Fleming, P.A., on brief), Baltimore, for appellants.

David R. Thompson (Roy B. Cowdrey, Jr. and Franch, Earnest & Cowdrey, P.A., on brief), Easton, for appellee, Weimer.

John H. Bolgiano (Smith, Somerville & Case, on brief), Baltimore, for appellee, Anne Arundel General Hosp.

Argued before ALPERT, BLOOM and ROBERT M. BELL, JJ.

BLOOM, Judge.

Jason Michael Hetrick, a premature baby delivered by caesarean section, died shortly after birth. As a result of the infant's death, his parents, Jody Ann Hetrick and Michael Cary Hetrick, sought to recover damages from various health care providers, including appellees, Dr. Stanley R. Weimer and Anne Arundel General Hospital. They were unsuccessful both at the Health Claims Arbitration level and at trial before a jury in the Circuit Court for Anne Arundel County. Appealing from the judgment of the circuit court, Mr. and Mrs. Hetrick make several assertions of error. Although he won below, Dr. Weimer cross-appealed in order to preserve an assertion of error in the event of reversal and retrial.

We find error in the instructions to the jury and reverse for that reason; we find no error in the court's ruling from which the cross-appeal was taken.

### Background

Jody Ann Hetrick was admitted to Anne Arundel General Hospital on September 2, 1978, suffering from nausea, vomiting, abdominal pain, and several other symptoms. She was in her thirty-first or thirty-second week of pregnancy. She was under the care of Dr. Thomas E. Moeser, her obstetrician, and his associate, Dr. John S. Harris. Dr.

Moeser concluded that Mrs. Hetrick was suffering from gastroenteritis and possible cholecystitus. An exploratory operation was performed, under general anesthesia, on the morning of September 9, 1978, during which it was discovered that Mrs. Hetrick's gall bladder was normal but her liver was edemic, indicating severe preeclampsia [1] which had gone undiagnosed by Dr. Moeser for a week or more.

Mrs. Hetrick and her husband, Michael, were informed of Mrs. Hetrick's condition. The most common treatment for preeclampsia, apparently, is to deliver the child, even though the child will be premature. Mrs. Hetrick agreed to undergo a caesarean section immediately. On the evening of the same day on which the laparotomy was performed, Jason was delivered, eight to nine weeks prematurely, by caesarean section. He weighed 1531 grams.

Mrs. Hetrick met appellee Dr. Weimer, a pediatrician and neonatologist, for the first time in the operating room immediately before the delivery. Mrs. Hetrick testified that he introduced himself and said, "I'm here for the baby." Mrs. Hetrick also testified that she was not aware that Dr. Weimer had been called in by her own doctors.

Jason was born in an extremely poor condition. He was immediately put under the care of Dr. Weimer, who tried various methods to improve the baby's cardiopulmonary responses and blood sugar level for the next eight to ten hours. Alleged inadequacy of those measures formed the basis of the negligence action below. Several hours after birth, Jason was transferred to the neonatal intensive care unit at Saint Agnes Hospital in Baltimore to be placed

---

1. Eclampsia is indicated by "[c]oma and convulsive seizures between the 20th week of pregnancy and the end of the first week [after childbirth]." It is usually fatal if untreated. 14 *Taber's Cyclopedic Medical Dictionary*, 448 (1981). Preeclampsia is "[a distribution throughout the body of poisonous products of bacteria during pregnancy] characterized by increasing hypertension, headaches, albuminuria, and edema of the lower extremities." If untreated, the patient may develop true eclampsia. *Id.* at 1149.

under the care of Dr. Giangreco, another neonatologist. Jason died not long thereafter.

On August 21, 1982, the Hetricks filed a claim with the Health Claims Arbitration Office (HCAO) as the parents of Jason. Jody also filed as the personal representative of Jason's estate. The claim was filed against Drs. Moeser, Harris, and Weimer, Anne Arundel General Hospital, and Saint Agnes Hospital. On December 1, 1982, the Hetricks released Dr. Moeser for the consideration of $100,000, executing a Joint Tortfeasor Release. Their claim against Dr. Moeser was dismissed the same day. Two days later, third party claims were filed against Dr. Moeser by Dr. Harris, Dr. Weimer, and Anne Arundel General Hospital.

An arbitration panel of the HCAO issued its determination on May 18, 1983. The panel found "no liability on part of [sic] ... St. Agnes Hospital, Anne Arundel General Hospital, Stanley R. Weimer, M.D., and John S. Harris, M.D., or against anyone other than Thomas E. Moeser, M.D." The panel awarded damages of $125,000.

Because of their release of Dr. Moeser, the Hetricks clearly did not benefit from the panel's determination. On May 27, 1983, they filed a notice of rejection of the panel's decision and a declaration and election for jury trial in the Circuit Court for Anne Arundel County, suing Dr. Weimer, Dr. Harris, and Anne Arundel General Hospital for negligence. On the same day the Hetricks filed two other pleadings, one captioned "Action to Nullify Award" and the other a preliminary motion to vacate the award. Dr. Moeser also filed a motion to vacate the award as to him.

In July of 1983, Dr. Weimer, Dr. Harris, and Anne Arundel General Hospital each filed a general issue plea to the declaration and a third party claim against Dr. Moeser.

On November 3, 1983, Dr. Moeser's motion to vacate the panel's award against him was granted on the basis that, due to the Hetricks' release, the panel had no jurisdiction over Dr. Moeser unless the third party plaintiffs were found liable. Since no one other than Dr. Moeser was held liable,

the court granted his motion to vacate. The court denied the Hetricks' motion to vacate the award *in toto*.

On February 13, 1984, the Hetricks released Dr. Harris in return for approximately $2100. They dismissed their suit against Dr. Harris on February 21, 1984, the first day of trial. The remaining defendants unsuccessfully sought a continuance, complaining that the release was secret and that it deprived them of the use of Dr. Harris as a witness.

Trial commenced before a jury on February 21, 1984. Testifying as an expert witness in neonatology on behalf of the Hetricks was Dr. Kenneth Harkavy. During direct examination, Dr. Harkavy gave his opinion as to the cause of Jason's death. He said:

> Based on the review of all three sets of records, the underlying cause [of Jason's death] is that of perinatal asphyxia which begins around the time of birth and continued after delivery, compounded by prematurity and hyaline membrane disease. The prematurity in itself prevented the baby from successfully recovering from his difficulties at birth in respiring insufficiency.

Dr. Harkavy also said that "[t]he lack of adequate resuscitation I think allowed the asphyxia or lack of oxygen, the buildup of acidosis to continue after birth." He concluded that "what we're seeing is that the asphyxia continues and as we've already talked about, I think it's because the baby was not adequately ventilated." [2]

At the close of the Hetricks' case, Dr. Weimer and Anne Arundel General Hospital each moved for a directed verdict. The court denied Dr. Weimer's motion but granted the hospital's motion on the grounds that there was no evidence that Dr. Weimer was its agent and insufficient evidence that the hospital's nurse was negligent. The jury returned a verdict in favor of Dr. Weimer.

---

2. Dr. Harkavy opined that additional measures should have been taken by those attending Jason to ensure that sufficient oxygen was introduced into the infant's lungs to allow adequate oxygenation of the blood.

*Issues*

On appeal, the Hetricks contend that the trial court erred in denying their preliminary motion to vacate the panel's award, that the court erred in granting Anne Arundel General Hospital's motion for a directed verdict, and that the court committed three errors in instructing the jury. In his cross-appeal, Dr. Weimer argues that the court erred in not permitting him to read in court the deposition testimony of an out-of-state doctor and in striking the transcript from evidence.

## I. Motion to Vacate

Appellants' first contention is that the court below erred in denying their preliminary motion to vacate the award of the panel. We find no error.

In accordance with Md.Cts. & Jud.Proc.Code Ann. § 3–2A–06(b) (1984), appellants filed a written motion to vacate the award of the panel on the grounds that, *inter alia*, the panel found against Dr. Moeser, who had already been dismissed by virtue of the agreement reached between the doctor and appellants. Appellants also contended that the panel improperly permitted the filing of third party claims which brought Dr. Moeser back into the controversy.

By a written opinion and order dated November 3, 1983, the court denied appellants' motion, ruling as follows:

The claimant also argues that the result of the Panel shows such confusion as to vacate the award. We have already vacated the award against Dr. Moeser. The remainder of this decision makes it clear that the Panel found no negligence on behalf of anyone else. Plaintiff tells us that the Panel wanted to give Plaintiffs some award; it did, but obviously only against Dr. Moeser. If the Panel had found only Dr. Moeser liable, then announced that he had been released, we would let the finding stand. Since we hold the award against Dr. Moeser as surplusage at this point, we allow it to stand.

On appeal, the Hetricks argue that the panel was "either incompetent or totally confused" and that the award was

completely irrational. They rely on *O–S Corporation v. Samuel A. Kroll, Incorporated,* 29 Md.App. 406, 348 A.2d 870 (1975), *cert. denied,* 277 Md. 740 (1976), which they contend states that an arbitration award may be set aside if it is completely irrational. *O–S Corp.* narrowly dealt with an arbitrator's interpretation of a construction contract, but it does express the generally accepted rule that a completely irrational arbitration award may be vacated by a court, because in making such an award arbitrators would be exceeding their powers and employing undue means, two of the limited grounds upon which a court may vacate an arbitration award. Md.Cts. & Jud.Proc.Code Ann. § 3–224(b) (1984).[3] The award in this case, however, clearly does not fall into the category of "completely irrational." It is true that the panel entered an award against Dr. Moeser unnecessarily; but as the court quite aptly observed, that award was mere surplusage. Its presence simply does not connote arbitrary or irrational judgment by the panel members.

■ Appellants argue that since Dr. Moeser had already been dismissed the award against him shows the panel's complete lack of understanding of the case. We disagree. Although Dr. Moeser had been dismissed by appellants, he had been brought back in as a third party defendant. While

---

**3.** Section 3–224(b) reads as follows:

(b) *Grounds.*—The court shall vacate an award if:

(1) An award was procured by corruption, fraud, or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown for the postponement, refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 3–213, as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement as described in § 3–206, the issue was not adversely determined in proceedings under § 3–208, and the party did not participate in the arbitration hearing without raising the objection.

it is true that the award against him is meaningless without liability attaching to the remaining defendants (third party plaintiffs), the panel award amounts to no more than a finding that Dr. Moeser, and only Dr. Moeser, was "at fault." That finding does not come under the category of "completely irrational." Nor can it be said that any panel member exceeded his authority by rendering an arbitrary result, as proscribed in *Prince George's County Educators' Association, Inc. v. Board of Education of Prince George's County*, 61 Md.App. 249, 486 A.2d 228, *cert. granted*, 303 Md. 114, 492 A.2d 616 (1985).

## II. Motion for Directed Verdict

Appellants next contend that the court below erred in granting Anne Arundel General Hospital's motion for directed verdict. The hospital made its motion at the close of appellants' case, and the judge granted it after hearing from both sides. Appellants maintain that there was sufficient evidence to allow the jury to consider the hospital's liability due to the acts of one of its nurses and because Dr. Weimer was the hospital's agent. We disagree.

In order to find the hospital liable for any negligent acts of Dr. Weimer, the jury would have to conclude that Dr. Weimer was the hospital's agent. There was no evidence that Dr. Weimer was in the employ of the hospital or had had actual or express authority to act on its behalf. It was Dr. Harris, not the hospital, who brought in Dr. Weimer to care for Jason.

Nor did appellants present any evidence that would support the theory that Dr. Weimer had apparent authority to act as an agent for the hospital. One party may be held liable, as a principal, for acts of another party when the purported principal has, by words or deeds, induced a third party to believe that the purported agent is acting on behalf of the purported principal. The principal-agent relationship is created, therefore, only if a third party has been misled by and relies upon the apparent authority of the supposed

agent. "Apparent authority results from certain acts or manifestations *by the alleged principal* to a third party leading the third party to believe that an agent had authority to act." *Klein v. Weiss,* 284 Md. 36, 61, 395 A.2d 126 (1978) (emphasis added).

> Succinctly stated, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct *of the principal* which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

*Parker v. Junior Press Printing Services, Inc.,* 266 Md. 721, 727–28, 296 A.2d 377 (1972) (emphasis added). To be liable to appellants for the acts or defaults of Dr. Weimer, Anne Arundel General Hospital, and not Dr. Weimer, would have to have said or done something to cause Mrs. Hetrick to believe that Dr. Weimer was the hospital's agent. There was simply no evidence of any words or conduct on the part of the hospital that could have induced such a belief.[4]

On direct examination Mrs. Hetrick testified that, to her knowledge, Dr. Weimer came from Anne Arundel General Hospital. She said that she "was on the operating table and there was [sic] a lot of things going on but he came up and he said, 'Hello, I'm Dr. Weimer. I'm going to be here for the baby.'" On cross-examination, she testified that she never chose a pediatrician. Dr. Harris had given her a list of names but she made no selection because she assumed she had plenty of time to do so. That was the sum total of the evidence to support appellant's claim that the hospital was liable for Dr. Weimer's conduct. It was clearly inadequate for that purpose.

---

**4.** If, for example, a hospital has residents and/or interns on its staff, that fact alone might be sufficient to create in the patient a reasonable belief that a physician who is unknown to her and who appears on the scene to examine, attend or treat her is supplied by the hospital for that purpose. There was no evidence that Anne Arundel General Hospital is, or holds itself out to be, such an institution.

Appellants' reliance upon *Mehlman v. Powell*, 281 Md.
269, 378 A.2d 1121 (1977), is misplaced. In *Mehlman,* the
decedent went to the emergency room of Holy Cross Hospi-
tal. The attending physician in the emergency room made a
faulty diagnosis, as a result of which the decedent was sent
home, where he died. When the decedent's widow and
children sued, the hospital contended that the emergency
room was completely controlled and operated by an indepen-
dent contractor and thus the negligent physician was not an
agent of the hospital. The Court of Appeals disagreed with
that contention, holding that under the circumstances the
decedent was led to believe that he was submitting himself
to the care of the hospital and its personnel.

The case *sub judice* is easily distinguishable from *Mehl-
man.* Mrs. Hetrick did not go to Anne Arundel General
Hospital to seek the services of a pediatrician, and there
were no surrounding circumstances to indicate that the
hospital was supplying pediatric services. Mrs. Hetrick
may have assumed that Dr. Weimer was "from the hospi-
tal," but not on the basis of anything the hospital did to
foster that belief. In *Mehlman,* however, the Court noted
that Holy Cross Hospital "is engaged in the business of
providing health care services. One enters a hospital for no
other reason. When [the decedent] made the decision to go
to Holy Cross Hospital, he obviously desired medical servic-
es and *equally obviously was relying on Holy Cross Hos-
pital to provide them.*" 281 Md. at 274, 378 A.2d 1121
(emphasis added). As the Court explained, "[A]ll appear-
ances suggest[ed] and all ordinary expectations [were] that
the Hospital emergency room, physically a part of the
Hospital, was in fact an integral part of the institution."
*Id.* In short, Holy Cross Hospital held out the emergency
room and its personnel as a part of the Hospital. That was
not the case here.

■ The nurse who attended Jason, on the other hand,
was an employee of the hospital. But there was a failure to
prove actionable negligence on her part. There was evi-

dence that the nurse failed to record the results of blood sugar tests as ordered by the doctor, from which a logical inference could be drawn that she failed to perform the tests and therefore failed to follow the attending physician's orders, which would have been a breach of her duty in caring for the infant. Breach of duty, however, is but one element of actionable negligence. That breach must be shown to have been the proximate cause of the injury for which suit is brought, and there was no evidence from which the jury could reasonably have found such a causal connection. Indeed, there was no attempt on the part of any of appellants' witnesses to link the failure to test hourly for blood sugar to the infant's failure to survive.

We hold, therefore, that the court did not err in granting the hospital's motion for directed verdict.

### III. Instructions

Appellants argue that the court committed three errors in instructing the jury; first by instructing that Dr. Weimer was presumed to have performed his medical duties with care and skill, second by instructing improperly on burden of proof, and third by refusing to give an instruction consistent with the holding of *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972).

### A. Presumption

In the course of instructing the jury, the trial judge said, "Now the law presumes that Dr. Weimer, the pediatrician in this case performed his medical duties with care and skill." Shortly thereafter he added: "The law doesn't require that treatments given by a doctor to a patient be nearly perfect or attain perfect results. The doctor is not responsible for lack of success or an honest mistake or exercising judgment even if hindsight shows a different course of action would have been preferable." Appellants' counsel admits that he let the "honest mistake" instruction slip past without objecting to it but argues that we should read the instructions as a whole in reviewing their propriety.

■ Appellants are correct in asserting that the use of the word "presumed" was in contravention of our opinion in *Riffey v. Tonder*, 36 Md.App. 633, 375 A.2d 1138 (1977). In *Riffey*, the trial judge told the jury, "You are instructed that the law *presumes*, in the absence of evidence to the contrary, that a physician and a hospital has [sic] performed their respective duties with the required degree of care and skill." *Id.* at 648, 375 A.2d 1138 (emphasis in original). That instruction is quite similar to the one given in this case. In *Riffey* we expressed displeasure over the use of the term "presume" and warned that "we eschew the continued use of the term in describing the burden of proof in medical malpractice actions." *Id.* at 650, 375 A.2d 1138. In *Riffey*, however, we were satisfied that the instructions taken as a whole did not improperly describe the burden of proof to be borne by plaintiffs. *Id.*

■ Similarly, although the instruction at issue ignored our disapproval of the word "presume," we find that the instructions as a whole properly described appellants' burden of proof. Immediately after the offending comment, the trial judge continued:

Now the plaintiffs have to show to your satisfaction by evidence more likely than not that Dr. Weimer did not use that degree of care and skill which a reasonably competent pediatrician, and I say reasonably competent, not the most brilliant pediatrician, but a reasonably competent pediatrician engaging in a similar practice and acting in similar circumstances would use. In which case, Dr. Weimer is guilty of malpractice.

Now I said by evidence more likely so than not. The plaintiff has to prove each and every fact necessary to find Dr. Weimer guilty of malpractice. And he has to do that by evidence more likely so than not. And if your mind is in a state of even balance and he hasn't done what the law requires him to do, then you have to find against him.

Now what does that mean? The example—counsel used the example of scales. I like the example of a ballgame. If on the points or any one point that the Hetricks have to prove it's a tie ballgame, then the Hetricks lose. That's what I mean by state of even balance. There's no such thing as a tie game in a court. A tie game is a loss. The Hetricks have to do better than a tie game. It has to be at least one to nothing, seven to six but they have to do better than a tie game.

Now when you hear me refer to the Hetricks having to prove a point by evidence more likely so than not and if your mind is in a state of even balance then you must find against them on that point. That's what I mean.

The use of "presume" is frowned on because one of its connotations involves shifting the burden of proof. Where the court correctly explains which party has what burden of proof, the use of the term, while disfavored, is not reversible error.

■ Similarly, the remark as to an "honest mistake" is, in context, not erroneous. Immediately after making that comment, the court continued:

To hold Dr. Weimer liable, the plaintiffs have to show that his conduct was clearly not recognizable as medically acceptable. And no pediatrician is chargeable with the results of his efforts if he has applied the degree of skill ordinarily required to be expected of a pediatrician in the performance of the services required. And you have to keep in mind the circumstances as they existed at the time of the treatment and the nature and complexity of the medical problems facing the pediatrician at that time. If you find that Dr. Weimer, under those circumstances as they then existed rather than by hindsight, exercised that reasonable degree of care and skill, then you must find in favor of the doctor.

We find no reversible error in those instructions.

## B. Burden of Proof As to Causation

Appellants' last two contentions involve the court's instructions to the jury regarding the plaintiffs' burden of proof on the issue of causation. We will consider them together.

Appellants' expert witness, Dr. Harkavy, testified that an infant in Jason's condition at birth [5] would have an 85 to 90 percent chance of survival if given proper medical care and that 80 to 90 percent of all such infants who do survive will be normal. He then opined that the reason Jason did not survive, that is, the cause of Jason's death, was perinatal asphyxia which continued because Jason was not properly ventilated by his attending physician, Dr. Weimer.

The court instructed the jury that in order to recover the Hetricks had to prove that Dr. Weimer failed to use the proper degree of care and skill and that that failure, or breach of duty, was the proximate cause of Jason's death. And this, the court explained, had to be proved by a preponderance of the evidence. The court elaborated that the Hetricks had to prove that Dr. Weimer's failure to use the required degree of care and skill was the *most likely cause* of Jason's death. The instructions as to proof of causation were as follows:

Now plaintiffs need only prove the most likely cause of the baby's death in addition to everything else that I've said. The plaintiffs are not required to negate or exclude every other possible cause. However, if there are two or more causes, either of which could have resulted in the baby's death, one of which for which the pediatrician is responsible, and the others for which he is not, then the plaintiffs have to prove by evidence more likely so than not that the acts for which the pediatrician is responsible in fact caused the baby's death. Now there I've used that phrase by evidence more likely so than not.

---

**5.** That is, an infant weighing 1,531 grams, delivered by caesarean section at a gestational age of thirty-two or thirty-three weeks, and whose mother was suffering preeclampsia.

Take the example in this case, and it is strictly an example, and I don't mean to infer that these are the facts. Again, I'm only doing this to clarify what I've just said. You have to decide what the facts are. But if you should find that Dr. Weimer was responsible for the lack of oxygen and that was 50% of the cause of the death and if you feel that the prematurity was 50% of the cause of the death, then that's the standoff again. We got two causes of action. There are two possible causes of death that are both equal. If that's the case, the plaintiff hasn't done what the law requires and you must find in favor of the doctor. The plaintiff has to show that the act for which the doctor is responsible for is better than 50%, 51%. That's better.

Appellants duly excepted to those instructions and to the court's refusal to grant their requested instruction, based upon *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972), to the effect that "all the plaintiff need prove is that failure to properly resuscitate took away a substantial possibility that the child would have survived."

*Thomas v. Corso*, upon which appellants rely, was a case in which Corso, the victim of an automobile accident, was taken to the emergency room of a hospital where he complained to a nurse of pain and numbness in his thigh. Dr. Thomas, the physician on call, was at home when Corso was admitted. The nurse telephoned Dr. Thomas and gave him the patient's history and vital signs. Dr. Thomas, who lived only a ten minute drive away, did not go to the hospital to see Corso. Over the next several hours, Corso's vital signs deteriorated until it was evident he was in shock. When the attending nurses again called the duty physician, Corso was near death. Dr. Thomas arrived at the hospital in time to pronounce Corso dead. It was later discovered that Corso had sustained bone fractures and internal injuries.

In rejecting Dr. Thomas's contention that the evidence failed to establish a causal connection between his alleged negligence and Corso's death, the Court of Appeals quoted

the following passage from the opinion authored by Circuit Judge Sobeloff in *Hicks v. United States,* 368 F.2d 626, 632 (4th Cir.1966):

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly.

The "substantial possibility of survival" standard announced in *Hicks* and adopted in *Thomas v. Corso* has not been widely accepted. Courts which have rejected the *Hicks* standard have generally done so on the basis that it "derogate[s] the well-established and valuable proximate cause considerations." *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97, 103 (1971). In *Cooper,* a sixteen-year-old boy died of injuries to his head and back, including a basal skull fracture which went undiagnosed and untreated at the defendant hospital's emergency room. An expert witness for the plaintiffs testified that such an injury is almost certainly fatal if not treated and is still fatal about 50 percent of the time even if properly treated. The Court found that degree of possibility to be insufficiently high and affirmed a directed verdict for the defendant, stating that traditional proximate cause standards require that the trier of facts, at a minimum, must be provided with evidence that a result was more likely than not to have been caused by an act, in the absence of any intervening cause. Accordingly, it ruled that "plaintiff in a malpractice case must prove that defendant's negligence, *in probability,* proximately caused the

death." *Id.* (emphasis in original). That was the standard applied by the trial judge in the case *sub judice* in his instructions to the jury.

 We believe the court's instructions as to causation were erroneous. A physician's duty to his patient is not merely to avoid killing the patient; it is to save the patient if he can reasonably do so by the application of an appropriate degree of skill and care. Thus, the instruction that the plaintiffs had to prove, by a preponderance of the evidence, that the physician's negligence was the primary or most probable cause of the patient's death imposed an improper burden upon them. The theory of appellants' case was not that Dr. Weimer caused their son's death; it was that Dr. Weimer's failure to do what was reasonable, proper, necessary and appropriate to resuscitate Jason deprived the child of a substantial possibility of survival.[6]

---

**6.** *See* J.H. King Jr., "Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences," 90 Yale L.J. 1353–1379 (1981). Professor King suggests that in analyzing problems of this nature it might be better to consider the loss of a substantial chance of survival as a different type of loss, with a different measure of damages, than the loss of life, instead of treating the former as a variation on the burden of proving causation in a claim for negligently causing the patient's death. As Professor King puts it, "The problem ... is not the standard of proof, but the object to which that standard is applied: the interest for which relief is sought." *Id.* at 1366. He elaborates:

> [This] type of loss involves the destruction of a chance of completely avoiding an adverse result or of achieving a definitive favorable result. Most courts have misperceived the nature of the interest destroyed by failing to identify the destroyed chance itself as the compensable loss. Instead, they have treated the chance of avoiding the loss as if it were either a certainty or an impossibility, depending on whether, (under the traditional standard of proof) the tortiously reduced likelihood of loss avoidance was better than even. Thus, the plaintiff will recover for a lost opportunity only if it appears more likely than not that but for the tort some definitive adverse result would have been avoided. His recovery, however, will not be discounted by the chance that the loss might have occurred even absent the tort. Conversely, the plaintiff recovers nothing for the lost chance if the probability of that chance does not rise to the level required by the applicable standard of proof.

It is a well-established principle that a litigant is entitled to have the jury properly instructed upon his theory of the case, *Shaefer v. Publix Parking Systems,* 226 Md. 150, 152, 172 A.2d 508 (1961), provided, of course, it is a correct exposition of the law and there is evidence in the case to support it. *Levine v. Rendler,* 272 Md. 1, 12, 320 A.2d 258 (1974); *Fowler v. Benton,* 245 Md. 540, 548–49, 226 A.2d 556, *cert. denied,* 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119, *reh'g denied,* 389 U.S. 996, 88 S.Ct. 460, 19 L.Ed.2d 505 (1967); *Dorough v. Lockman,* 224 Md. 168, 171, 167 A.2d 129 (1961).

■■■■■■ Appellants' theory of the case—that Dr. Weimer is liable if his negligent failure to ventilate Jason in a proper manner deprived the infant of a substantial possibility of surviving—is unquestionably a correct exposition of the law. *Thomas v. Corso, supra.* And it was supported by Dr. Harkavy's testimony to the effect that an infant presenting Jason's problems at birth would have an 85 to 90 percent chance of survival if properly ventilated. Consequently, appellants were entitled to an instruction adequately covering their theory, but not necessarily in the precise words they requested. The trial court may grant requested instructions or give its own instructions on particular issues or on the entire case; it need not grant any requested instructions if the matter is fairly covered by the instructions actually given. Md.Rule 2–520; *Sergeant Co. v. Pickett,* 285 Md. 186, 401 A.2d 651 (1979).

■■■■■■ In the case *sub judice,* the court's instructions did not fairly cover the issue or adequately present appellants' theory of the case. The court instructed the jury that appellants had to prove that Dr. Weimer's negligence was the most likely cause of death; that the doctor's actions or neglect amounted to more than 50 percent of the cause of

---

*Id.* at 1365 (footnote omitted). Professor King, a professor of law at the University of Tennessee College of Law, also wrote *The Law of Medical Malpractice in a Nutshell* (1977), which deals with some of these issues at pp. 196–205.

death; that if prematurity was as much the cause of death as Dr. Weimer's failure to ventilate, the plaintiffs had failed to meet their burden of proof. That is a far cry from a right to recover under the theory of *Thomas v. Corso;* an obligation to prove that the physician's neglect was *the probable cause of the patient's death* is by no means the same as an obligation to prove that the physician's neglect deprived the patient of a *substantial possibility of survival.* Because of this error in instructing the jury, we will reverse the judgment of the circuit court.

## IV. The Cross-Appeal

At some time prior to trial, the deposition of Dr. Harris was taken. At the time of trial, Dr. Harris was residing in Mississippi. Dr. Weimer offered Harris's deposition in evidence on the theory that the witness was no longer available. Basically, Harris's testimony was to the effect that his former associate, Dr. Moeser, had failed to diagnose Mrs. Hetrick's condition as preeclampsia, and Dr. Weimer offered the deposition in evidence as relevant to his defense of the Hetricks' claim against him and to his third party claim against Dr. Moeser. The court recognized the relevance of Harris's testimony with respect to a then-existing claim of negligence as to Mrs. Hetrick (Count II of the complaint) and admitted the deposition in evidence for that purpose. The court was not satisfied that there was any relevance to the claims in Counts I and III of negligence as to Jason and for that reason refused to let counsel read the deposition to the jury. When appellants dismissed Count II, the court struck Dr. Harris's deposition from the evidence.

Cross-appellant argues that in the event of a retrial the Harris deposition should be admitted into evidence because it is relevant to the issue of whether Dr. Moeser was a joint tort-feasor.

Although Dr. Harris's testimony tends to show that Dr. Moeser was negligent in failing to diagnose Mrs. Hetrick's condition of preeclampsia, it utterly fails to connect that negligence to Jason's condition. There is nothing in Dr.

Harris's testimony that in any way indicates that an earlier diagnosis of preeclampsia would have given Jason a better chance of survival. Indeed, according to Dr. Harris, the mother's hypertension would tend to force the fetus's lungs to develop earlier. Since the ultimate treatment for preeclampsia is to deliver the child, an earlier diagnosis of that condition might have lead to an even earlier caesarean delivery, resulting in an even poorer chance for the infant's survival. In any event, Dr. Harris specifically opined that the missed diagnosis had no significant effect on the infant. The court did not err in striking out the deposition.

It may be that in the event of a retrial Dr. Weimer might present other evidence tending to show that Dr. Moeser's failure to diagnose Mrs. Hetrick's condition was a contributing factor in Jason's death. If so, the Harris deposition could possibly be relevant to the issue of whether Dr. Moeser was a joint tort-feasor as to the infant. That, of course, is not before us at this time.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED FOR NEW TRIAL AS TO APPELLEE WEIMER. COSTS TO BE PAID ONE-THIRD BY APPELLANTS, TWO-THIRDS BY APPELLEE AND CROSS-APPELLANT STANLEY R. WEIMER.