619 A.2d 141

**FAIRFAX SAVINGS, F.S.B.**

v.

**Charles ELLERIN, et al.**

**No. 331 Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 27, 1993.

Reconsideration Denied Feb. 23, 1993.

Certiorari Granted March 26, 1993.

George A. Nilson, argued (Kurt J. Fischer, Marta D. Harting and Piper & Marbury, on the brief), for appellant.

David Freishtat, argued (Freishtat & Sandler, on the brief), Baltimore, for appellees.

Argued before BLOOM, WENNER and CATHELL, JJ.

BLOOM, Judge.

The predisposition of many persons to use their ingenuity to seek gainful advantage over others often takes some of them on a sojourn of dealings which are tainted by their false assertions or suggestions, or their failure to reveal certain relevant information to their unsuspecting and trusting prey.[1]

---

1. 2 J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice* § 19.0, at 1 (1985).

A jury determination that appellant embarked upon such a "sojourn of dealings," labeled in the pleadings and referred to in the testimony as "fraud," is at the heart of this appeal. The principal questions raised at trial were: (1) whether appellant, Fairfax Savings, F.S.B., committed fraud in its dealings with appellees, Charles and Naoma Ellerin and Louis and Gloria Seidel, who guaranteed three loans to Sherwood Square Associates (Sherwood), a limited partnership in which Messrs. Ellerin and Seidel were general partners; and (2) whether punitive damages could and should be awarded upon a finding that fraud was committed. What is at issue before this Court is whether the jury's verdicts resulted from one or more judicial errors in rulings made during the trial and in instructing the jury as to the law of the case at the conclusion of the trial.

Sherwood, as may be surmised, defaulted on the loans, and Fairfax brought a separate action on each loan against the guarantors in addition to an action against the general partners and, finally, an action against Charles Ellerin, individually. Appellees, as guarantors, filed counterclaims in which they alleged fraud, duress, and negligent misrepresentation and sought compensatory and punitive damages. The action against Ellerin individually resulted in a verdict for him, and is not involved in this appeal. The judgments appealed from represent the net result of directed verdicts in favor of Fairfax and against the partners and guarantors in the aggregate amount of $4,371,401.96 and jury verdicts in favor of appellees in the aggregate amount of $13,005,-966.08 on the fraud counts in their counterclaims.

Two of the issues raised by appellant concern jury instructions; the others concern an evidentiary ruling, denial of appellant's motion for summary judgment, and a ruling by the court that, as a matter of law, appellant had waived a contractual obligation of the debtor and guarantors. Appellant's assertion of error in instructing the jury on the elements of fraud was not preserved for appellate review, and we perceive no reversible error in the court's rulings on the evidence, the summary judgment motion, or the waiver

issue. We believe, however, that the court's instruction to the jury with respect to punitive damages was deficient. We shall vacate the judgment for punitive damages and remand for a new trial on that issue.

## I

## FACTUAL BACKGROUND

The litigation in this case has a long and complicated history. In December of 1983 Fairfax F.S.B. (then Fairfax Savings Association) made three loans, totalling $5.7 million, to Sherwood Square Associates for the acquisition and renovation of four "shell" buildings located in the City of Westminster. The buildings were to be renovated into a shopping and office facility. Charles Ellerin and Louis Seidel were the general partners of Sherwood and the owners of Tri–Ess, Inc., the general contractor for the project. Ellerin and Seidel, together with their wives, Naoma Ellerin and Gloria Seidel, and Tri–Ess, Inc., as guarantors, joined with Sherwood in entering into a Development Agreement, a Loan Agreement, and a Completion Guaranty with Fairfax and the city. The city issued two Industrial Revenue Bonds (IRB's) in the amounts of $3,050,000 and $1,800,000, respectively, which were both subsequently acquired by Fairfax, and Fairfax made an additional conventional loan to Sherwood of $850,000.[2] The Completion Guaranties, two identical sixteen-page documents, required the guarantors to guarantee completion of the facility and repayment of the IRB loans up to $2.3 million (a $1.15 million guaranty on each loan). The guarantors' liability would be reduced in proportion to the leasing of the facility, eventually terminating upon its completion and the leasing of 70% of its total square footage, i.e., a "rent roll" formula. The Development Agreement required Sherwood to guarantee completion of the project and to post $50,000 security.

---

2. The $850,000 loan was paid prior to the onset of litigation.

Sherwood defaulted on the loan in November 1985. Fairfax sued Sherwood and the partners in two cases, seeking $1,671,740 and $2,823,689, the balance on the loans, and sued the guarantors in three other cases.[3] Confessed judgments were docketed, but the guarantors moved to vacate the confessed judgments on the ground that the Completion Guaranty had been altered to extend their liability past the point of actual completion. This alleged alteration took place after the guarantors' attorney had reviewed what were supposed to be final prior drafts of the closing documents but before settlement, when the documents were executed.[4] Sometime between December 23 and December 29, the date of closing, sections 3.1(b), (c) and 8.1 of the Completion Guaranty and section 4.1 of the Loan Agreement were altered to impose $2.3 million in IRB guaranties on the Guarantors and $4.85 million in post-completion guaranties on Ellerin and Seidel as general partners. The motion to vacate was granted; the guarantors filed an answer and counterclaim alleging fraud, duress, and negligent misrepresentation, claiming $6 million in compensatory and $10 million in punitive damages. The Guaranty and Partnership cases were consolidated.

A jury trial began on 2 September 1987 and ended on 2 October 1987 when the jury, having found that Fairfax had fraudulently included a payment guarantee in the Completion Guaranty documents but that the guarantors had ratified the fraud, awarded Fairfax $2,303,946 against the

---

**3.** These cases included Fairfax's claims against Ellerin, *et al.*, based on a Completion Guaranty executed in connection with a $3.05 million loan (85–C6–3775) (Guaranty case), Fairfax's claims against Ellerin, *et al.*, based on a Completion Guaranty executed in connection with a $1.8 million loan (85–C6–3776) (Guaranty case), the claims of Ellerin *et al.* against Fairfax based on the Completion Guaranty (85–C6–4168), Fairfax's claims against Ellerin and Seidel as general partners on the $3.05 million loan Agreement (85–C6–3767) (partner case), and Fairfax's claims against Ellerin and Seidel as general partners on the $1.8 million Loan Agreement (85–C6–3768) (partner case).

**4.** Closing of these loans occurred December 29 and 30, 1982. The last version of the Loan Documents that Ellerin's and Seidel's attorney acknowledged reviewing was dated December 23, 1982.

guarantors. The court then entered judgment in the amount of $5,263,688.75 against Ellerin and Seidel in the Partnership cases.

An appeal was taken from that judgment, and on 9 February 1989 this Court reversed it. *Ellerin v. Fairfax Sav. Ass'n,* 78 Md.App. 92, 552 A.2d 918, *cert. denied,* 316 Md. 210, 557 A.2d 1336 (1989).

A fifth suit was filed by Fairfax on 23 December 1988, alleging the use of a fraudulent financial statement by Ellerin. That case was consolidated and tried with the others. The result was a hung jury.

A third trial began on 10 April 1991. At that trial, Fairfax offered testimony to show that the post-completion payment obligation of the borrowers was inadvertently left out of the loan document circulated on 22 December. Richard Jacobs, the loan officer who prepared the documents for closing, testified that it was always understood that the guarantors would personally guaranty the loan. Jacobs, along with David Blum, the former partner of Weinberg & Green's real estate department who drafted the loan documents, and Jack Stollof, senior executive vice president of Fairfax Savings Bank, testified that the executed Completion Guaranties contained the terms that were agreed upon during a telephone conference call held one week to ten days before closing. Ellerin and R. Bruce Alderman, Ellerin's counsel, denied the existence of the alleged conference call.

Blum further testified that he personally escorted Alderman to a reading room on the first day of closing, handed him the corrected Loan Documents, and indicated that Alderman remained in the room for one to two hours. All of that testimony was denied by Alderman.

Ellerin and Seidel offered testimony to the effect that the terms of the personal guaranty were established in three Commitment Letters prepared by Fairfax. Prior to this transaction, Ellerin had rejected a loan with another bank because it required a post-completion guaranty of $1,300,-000. No IRB post-completion guaranties existed in the

Loan Documents or Commitment Letters until mid-December, shortly before closing. Based upon the Commitment Letters, which Ellerin and Seidel believed to control the terms of the loan, and their reliance upon the statement of their attorney that he had reviewed the loan documents, neither partner read or reviewed any of the documents signed at closing.

Alderman testified that he did not participate in the alleged conference call prior to settlement and could not recall whether any changes had been brought to his attention by Fairfax. Although it is his practice to inquire of any changes, he could not recall making this inquiry and concluded that, since he did not read the final Loan Documents at closing, he must have made the inquiry and received some indication from Fairfax's counsel that no changes had been made.

David Bielawski, bond counsel for the City of Westminster and the sole unbiased witness of the proceeding, testified that he was unaware of any addition to the Completion Guaranties and did not re-read any of the loan documents at closing.

Under the Loan Agreement, completion of the facility required Sherwood to provide an architect's certificate to Fairfax indicating that the two larger buildings were completed according to the plans and specifications, and to submit proof that all contractors and subcontractors had been paid. The partners admitted that an architect's certificate was not filed.

At trial, the partners took the position that Fairfax had waived the completion requirements by releasing retainage funds to the guarantors,[5] converting the loans from construction to permanent status, accepting three and three-quarters percent interest in the gross revenues of the project under the Loan Agreement, and accelerating ap-

**5.** Retainage funds are funds held back by the lender, usually in the amount of 5 or 10 percent, until completion of the project. In the instant case Fairfax retained $430,000, 10% of the $4.3 million loan. Section 7.4 of the Loan Agreement provides that the holdback will be

proval of the Loan Agreement portion of the project for occupancy. Fairfax moved for summary judgment against Messrs. Ellerin and Seidel on the ground that, because Sherwood failed to complete the facility, Ellerin and Seidel, as partners, were liable for the entire balance of the debt. The court denied the motion, ruling, as a matter of law, that Fairfax had waived completion under the Loan Agreement because it had voluntarily released the retainage funds. The court also ruled that Sherwood's failure to complete the two smaller buildings was not of sufficient economic import to the overall project for Messrs. Ellerin and Seidel to be held liable under the Development Agreement as general partners.

The partners offered testimony to the effect that the rehabilitation of the smaller buildings was not part of the Loan Agreement. To support its contention that Sherwood failed to complete under the Development Agreement, Fairfax proffered that it had inspected the project monthly, that Sherwood had failed to pay Otis Elevator Company, that 100% of the budgeted work was completed, and that the final retainage of $430,000 was released as a business decision so that Fairfax would be able to reduce its loan exposure by $550,000 and receive $900,000 back for the release of the $430,000. The partners, asserting that Fairfax had waived completion, proffered testimony that no plans or specifications existed for the two small shell buildings, and that Fairfax's employee, Mr. Strausdaukis,[6] had inspected and approved completion, after which Fairfax paid approximately $4 million, and rolled the loan to permanent status. The trial court accepted these proffers out of the jury's presence and determined that waiver was not an issue for the jury under these facts.

---

retained until completion and approval by Fairfax's engineer and until Fairfax has been furnished with a copy of a certificate of completion, final waivers of all liens, and a copy of the permanent use and occupancy certificate.

**6.** The record is unclear as to the correct name and spelling of Fairfax's inspector.

The jury found that neither the partners nor their attorney were aware of the altered provisions of the IRB guaranties in the loan documents. The court directed a verdict in favor of Fairfax and awarded the bank $4,371,401.96 in damages, the amount owing on the loans, against the partners and $2,984,033.20 against the guarantors. On the fraud counterclaims, the jury returned verdicts of $7,022,-096.98 (which included the $4,371,401.96 directed verdict for Fairfax on the loans) and compensatory damages for emotional distress and pre-judgment interest in the amount of $2,650,695.00. The jury also awarded the guarantors $6,000,000 in punitive damages.

## II

## INSTRUCTIONS ON FRAUD

■ Fairfax contends that the trial court erred by refusing to give an elemental jury instruction on fraud. Fairfax further argues that the jury should have determined whether Fairfax made a misrepresentation and whether Ellerin and Seidel reasonably relied upon the misrepresentation in order to find fraud and award damages. Appellees assert that this issue was not properly preserved for appeal. Our review of the record persuades us that appellees are right. Nowhere in appellant's counsel's lengthy discourse on the instructions given by the court was there any mention of the elements of fraud, much less an exception to the failure to instruct the jury with respect to the elements of the tort. The principal complaint about the court's instructions regarding fraud was the emphasis placed by the court on whether there was a telephone conference call, seven to ten days before settlement, during which changes in the loan guaranty documents were discussed. Appellant's complaint was that the issue was whether Ellerin or his attorney was aware of the changes at any time before the closing documents were executed, not whether they were made aware of them as a result of the disputed conference call. Counsel expressed the exception to the instruction as follows:

It does not matter if this conversation (sic) call occurred. It matters what they knew about what was in the documents. It takes away from Fairfax what occurred at the closing table and whether they discovered certain changes to the documents, or if they were sitting at the closing table and you credit Mr. Epstein's testimony that the deal changed to become $850,000 conventional loan that they were under a burden to look at the documents. Your Honor has taken away anything that happened at the closing table and placed it on whether a conference call occurred. *We would ask the court to instruct the jury essentially and entirely on this issue and tell the jury that what matters is did they know what was in the document.* (Emphasis added.)

The use of the phrase "instruct the jury essentially and entirely on this issue," in the context of counsel's comments about the instructions, cannot possibly be read as a request for an instruction on the essential elements of the tort of fraud.

Md.Rule 2–520(e) is quite explicit:

No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

Appellant's failure to state distinctly that it objected to the court's failure to instruct the jury on the elements of the tort of fraud, so that the jury would have to decide whether there was a misrepresentation and, if so, whether appellees reasonably relied on it, precludes appellant from asserting that the court erred in that respect. The issue is not properly before us; we shall not address it.

### III

### REBUTTAL EVIDENCE

Fairfax contends that the trial court erred by refusing to permit Robert Cannon, one of the drafters of the loan

documents, to testify that Ellerin and Alderman attended a series of syndication meetings in 1983 and neither of them expressed surprise or raised any objection when the post-completion guaranties were discussed in their presence. We believe that the trial court ruled correctly in refusing to admit the rebuttal evidence.

In its case-in-chief, Fairfax offered testimony showing the existence of the loans to Sherwood, the agreement of Sherwood and its partners to repay the loan, the agreement of the guarantors to repay the loan until the facility was complete and 70% leased, the failure of Sherwood to repay the loan, and Ellerin's and Alderman's knowledge of the inserted guaranties. The guarantors presented evidence to the effect that they had no knowledge of the post-completion guaranties at the time of closing, that the post-completion guaranties had been fraudulently inserted, and that they did not discover the alleged fraud until 1984.

■ Fairfax argues that under the standard articulated in *Riffey v. Tonder,* 36 Md.App. 633, 645, 375 A.2d 1138 (1977), which defines rebuttal evidence as "any competent evidence which explains, is in direct reply to or a contradiction of material evidence introduced by ... a party in a civil action," Cannon's testimony should have been admitted. We disagree. The Court of Appeals first articulated the standard for determining what evidence may be used as rebuttal evidence in *Jones v. State,* 132 Md. 142, 103 A. 459 (1918), stating that a presiding judge has great discretion in determining whether to admit rebuttal evidence.

When the defendant has concluded his testimony, the plaintiff, in those cases where the burden of proof rests on him and where in chief he has accordingly gone into his whole case, is entitled to introduce what is called rebuttal evidence—that is to say, evidence in regard to such new points and questions as were first opened by defendant's evidence. The rule is that the plaintiff will be required to go fully into his own case-in-chief on those issues as to which he holds the substantial affirmative, and where, therefore, the burden of proof rests on him;

and hence, in reply to the case made by the defendant, he will ordinarily be limited to what is strictly rebutting evidence. Still, it is not always easy to draw the line between what is rebutting evidence and what is evidence properly adducible in chief. The subject is one which is addressed to the sound discretion of the Court; and the appellate Court will not reverse for an error on this point, unless the ruling of the Court below was both manifestly wrong and substantially injurious. Indeed, as a general rule, in such cases no appeal will lie.

*Id.* at 148–49, 103 A. 459, *citing* Poe, *2 Pleading and Practice* § 287. Rebuttal evidence is "any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense." *Mayson v. State,* 238 Md. 283, 289, 208 A.2d 599 (1965); *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445, 449 (1977).

■ The determination of what constitutes rebuttal evidence rests within the sound discretion of the trial court and its ruling will only be overturned upon proof that it is "manifestly wrong and substantially injurious." *Hepple,* 279 Md. at 270, 368 A.2d 445; *Mayson,* 238 Md. at 289, 208 A.2d 599; *Lane v. State,* 226 Md. 81, 90, 172 A.2d 400 (1961), *cert. denied,* 368 U.S. 993, 82 S.Ct. 611, 7 L.Ed.2d 529 (1962); *Snowden v. State,* 133 Md. 624, 636, 106 A. 5 (1919); *Jones,* 132 Md. at 149, 103 A. 459. In *State v. Hepple* the Court of Appeals held that the error committed by the trial court when it erroneously admits testimony as rebuttal testimony is not cured by the fact the court might have properly permitted the testimony in the exercise of its discretion to vary the normal order of proof. *Mays v. State,* 283 Md. 548, 556, 391 A.2d 429 (1978) (Eldridge, J., dissenting) (holding that a trial court has no discretion to reach a legally incorrect decision on whether evidence constitutes rebuttal evidence). Thus a clear error by the trial court in the determination of rebuttal evidence may not be cured through the application of the trial court's broad

discretion and may result in a reversal by the appellate court.

Fairfax argues that this case is like the factual scenario presented in *Riffey v. Tonder*, 36 Md.App. at 645, 375 A.2d 1138, where this Court held that plaintiff should have been permitted to use expert testimony to rebut defendant's reliance on an autopsy report because "it was not incumbent upon them to anticipate that appellees would rely upon the autopsy report to negate the presence of a pre-existent embolus or else be foreclosed from responding to such an assault upon their proof."

*Riffey* is distinguishable from the case at bar. In Riffey, the plaintiff sought to use expert testimony to show that autopsy reports are for the purpose of ascertaining the cause of death and not to explore peripheral questions. Because this was evidence that "truly tended to answer and contradict the testimony offered," it was appropriate rebuttal testimony. *Riffey*, 36 Md.App. at 646, 375 A.2d 1138. It was neither evidence that should have been elicited in the plaintiff's case-in-chief nor cumulative evidence. In this, its third trial, Fairfax anticipatorially rebutted Ellerin's and Alderman's testimony that they were unaware of the post-completion guaranties through the testimony of Messrs. Berman, Stollof, Cannon, Blum, and Jacobs. Cannon's proposed rebuttal testimony was offered to show that Ellerin and Alderman participated in a series of syndication meetings in 1983 and that discussions of the post-completion guaranties occurred at these meetings. Cannon was also prepared to testify that Ellerin either said something at a meeting in which he acknowledged the completion guaranties or made a tacit admission by silence when someone made a statement that, if untrue, would have prompted a response.

Cannon's testimony is not proper rebuttal testimony for several reasons. First, the issue of whether Ellerin and Alderman knew of the post-completion guaranties was raised in Fairfax's case-in-chief. While Fairfax did not raise

the issue of the syndication meetings at this time, it did raise, through various testimony, the issue of Ellerin's and Alderman's knowledge of the terms of the Loan Documents at closing. Second, Cannon's testimony was cumulative. He had already testified about Ellerin's and Alderman's knowledge of the loan documents. Furthermore, Ellerin, Alderman, Berman, Stollof, Blum and Singer were all present at these meetings and all testified during the course of the trial. Third, this testimony did not explain, respond to, or contradict any new matter introduced by the defense. Fairfax had already sought to show that Ellerin knew of the completion guaranties at closing in its case-in-chief. The trial court correctly phrased this issue as whether the post completion guaranties had been slipped into the loan documents. Regardless of the peripheral issues, Fairfax had already endeavored to prove that Ellerin knew of the guaranties; any alleged admission by Ellerin was proof of this assertion. Thus, Ellerin's asserted lack of knowledge was not a new issue when raised by the partners. Fourth, the trial court recognized this delayed attempt to offer in rebuttal evidence that could have been offered earlier as a trial tactic designed to present the last evidence on the subject to the jury. And, finally, it would merely tend to contradict or rebut Ellerin on a matter that did not directly relate to the issue. The essential dispute was whether the partners or their attorney were aware of the alterations in the guaranty documents at the time of settlement in December of 1982, not whether they remained unaware of the alterations until 1984 as Ellerin testified.

## IV

## SUMMARY JUDGMENT

Fairfax moved for summary judgment, contending that, regardless of any finding of fraud on its part as to post-completion guaranties, it was entitled to judgment against the partners, Charles Ellerin and Louis Seidel, as a matter

of law.[7] That contention is based upon the fact that the facility was never completed. Therefore, appellant argues, since the partners remained liable for the full amount of the debt under the Development and Loan Agreements until completion, they suffered no loss by virtue of the fact that the altered guarantee documents continued their liability for part of the debt beyond the time originally agreed on for termination of the guaranties.

Section 4.1 of the Loan Agreement provides that Ellerin and Seidel are liable as general partners until the Completion Guaranty terminates.[8] According to the altered versions of §§ 3.1 and 8.1 of the Completion Guaranty, termination occurs upon the acquisition of the facility, which requires the improvement of the facility (the land and buildings) in accordance with the plans and specifications. The allegedly fraudulent changes in § 3.1 of the Completion Guaranty altered Ellerin's and Seidel's obligation from "during the construction period of the loan" to "until termination of the Completion Guaranty pursuant to § 8.1," thereby increasing their obligation to $4.85 million until fulfillment of the leasing requirement. Fairfax relies upon the Completion Guaranty's reference to the Development Agreement to support its conclusion that the partners were personally liable for the outstanding loan as general partners until the facility was completed in accordance with both the Development Agreement and the Loan Agreement.

Completion under the Development Agreement differs from completion under the Loan Agreement and requires distinct elements. To achieve completion under the Loan

---

7. Fairfax's motion for summary judgment was filed pre-trial and held by the trial court until after the jury rendered its verdict.

8. Section 4.1 of the Loan Agreement provides, in pertinent part: [I]f an Event of Default occurs at any time after the termination of the Completion Guaranty (pursuant to Section 8.1 thereof), ... neither the Facility Applicant nor any person, individual or entity constituting the Facility Applicant or being a general Partner or a Limited Partner thereof shall have any financial responsibility with respect to the indebtedness referred to herein.

Agreement, Sherwood was required to submit both an ar-
chitect's certificate and proof that all contractors and sub-
contractors had been paid.[9] The Development Agreement
required Sherwood to complete construction of all four
buildings of the project. Fairfax conceded, however, that
the money loaned was for completion of the two main
buildings, which was the work provided for in the Loan
Agreement. The Loan Agreement, unlike the Development
Agreement, made no provision for work to be done on the
smaller buildings. Fairfax argues that, even if certain
provisions were fraudulently included in the loan docu-
ments, that would not affect Ellerin's and Seidel's obli-
gation to pay. In response, the partners argue that Fairfax
never requested that any specifications and plans be drawn
for the smaller buildings and no additional monies to com-
plete these projects had ever been sought. The partners
object to Fairfax's reliance upon the Completion Guaranty,
a document that was found by the jury to contain fraudu-

---

9. Section 6.5 of the Loan Agreement provides in pertinent part:
 SECTION 6.5. *Establishment of Completion Date.* The Comple-
 tion Date shall be evidenced to the Trustee and the Holder by a
 certificate signed by the Authorized Facility Applicant Representa-
 tive and by the Independent Architect stating in substance that (a)
 the acquisition of the Facility has been completed in accordance
 with the Plans and Specifications, (b) all labor, services, materials
 and supplies used in such acquisition have been paid for, (c) all
 other improvements necessary in connection with the Facility have
 been acquired and constructed, and all costs and expenses incurred
 in connection therewith have been paid, (d) all obligations, costs
 and expenses incurred in connection with the acquisition of the
 Facility and payable out of the Project Fund have been paid and
 discharged, except for amounts retained by the Trustee with the
 approval of the Authorized Facility Applicant Representative for the
 payment of costs of the Facility not then due and payable or then in
 dispute, (e) all of the Equipment has been purchased and installed
 in the Building and has been fully paid for, (f) the Facility is
 suitable and sufficient for its intended purposes, and (g) substantial-
 ly all (as defined in the Code) of the proceeds from the 1982 Series
 Bond theretofore advanced by the Trustee have been used for
 purposes allowable under Section 103(b)(2) of the Code. Such
 certificate shall have attached thereto final waivers of liens of the
 General Contractor and all subcontractors and suppliers as well as a
 copy of the permanent certificate of occupancy.

lent provisions, to support its claim for judgment against Ellerin and Seidel. After review of the evidence relating to the completion issue, the trial judge determined that Fairfax was not entitled to summary judgment. He stated, "I'm not satisfied that the reference to the Development Agreement in the Completion Guarantee entitles Fairfax to a judgment now that the jury has found that the guarantee is fraudulent."

 In deciding whether summary judgment may be granted, a trial court determines issues of law, resolving no factual disputes based upon the record. *See* Maryland Rule 2–501; *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985). Even if the underlying facts are undisputed but a conflict arises between the inferences that may be drawn from them summary judgment is not proper. *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090 (1979). The appropriate standard of appellate review of a trial court's grant or denial of summary judgment is whether the trial court was legally correct. *Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990).

 In determining the legal correctness of the trial court's denial of Fairfax's motion for summary judgment, therefore, we must endeavor to discern whether a material issue of fact existed and whether Fairfax was entitled to judgment as a matter of law. *Whitcomb v. Horman,* 244 Md. 431, 224 A.2d 120 (1966). The facts are undisputed on only three issues: an architect's certificate was not obtained by Sherwood, all four buildings were not completed, and Fairfax released $430,000 in retainage funds. The parties dispute whether releasing the retainage funds constituted a waiver of completion requirements and whether Fairfax may rely on the partners' failure to complete the smaller two buildings under the Development Agreement when the document referring to the Development Agreement, the Completion Guaranty, was determined by the jury to be fraudulent.

We hold that the trial court correctly denied Fairfax's motion for summary judgment. Fairfax was not entitled to judgment as a matter of law because, as the court concluded, the Development Agreement could not be sanitized from the taint of the fraudulent Completion Guaranty. If for no other reason, the fact that there was evidence that would permit—if not compel—the conclusion that Fairfax had waived the contractual requirement for completion, Fairfax was not entitled as matter of law to judgment based upon non-completion.

## V

### WAIVER OF COMPLETION, AS MATTER OF LAW

As a backup position to its contention that it was entitled to summary judgment against Ellerin and Seidel because they did not complete the project, Fairfax asserts that the trial judge erred in ruling as a matter of law that it had waived the Loan Agreement completion requirements. Appellant argues that it was at least entitled to have the issue of waiver submitted to the jury. Because of the posture of the case at the time this issue arose, we perceive no reversible error. Indeed, we believe that appellant has raised the wrong issues in its appeal and failed to preserve issues that would be appropriate to obtain our review of the alleged error.

The distinction between law and fact and the appropriate role of the judge and jury relating thereto is well established but not always easily applied. Ordinarily, the judge determines matters of law. *University Nat. Bank v. Wolfe,* 279 Md. 512, 369 A.2d 570 (1977). The judge must instruct the jury on the applicable law while the jury's function is to determine the facts.[10] The function of a jury is to resolve conflicts in the evidence, assess the credibility

---

**10.** *"Ad quaestionem facti non respondent judices ad quaestionem leges non respondent juratores." Glasgow v. Hall,* 24 Md.App. 525, 532 n. 4, 332 A.2d 722 (1975).

of witnesses, and make determinations of fact, after proper instruction by the court. *Krieger v. City of Baltimore*, 234 Md. 382, 199 A.2d 363 (1956). But when the facts are uncontradicted, undisputed, *see Whitehead v. Safway Steel Products, Inc.*, 304 Md. 67, 497 A.2d 803 (1985), conceded or admitted, *see Peroti v. Williams*, 258 Md. 663, 267 A.2d 114 (1970), or are found by a jury, or where the thing is self-evident or proves itself, or where only one conclusion or inference is reasonably possible from the evidence, then the question presented is one of law for the trial court. *See C.S. Bowen Co. v. Maryland Nat. Bank*, 36 Md.App. 26, 373 A.2d 30 (1977); 88 C.J.S. § 210. *See generally Rubinstein v. Jefferson Nat. Life Ins. Co.*, 268 Md. 388, 302 A.2d 49 (1973) (court may remove issue from jury's consideration when there is no rational ground upon which a differing verdict could be based).

■ In essence, appellant now seeks to have us determine whether the trial court, in applying this law, erred in ruling, as a matter of law, that waiver of the completion issue had occurred. The questions framed by appellant, however, are not properly before this Court.

The first barrier appellant faces arises from the fact that the trial court did not rule on either the summary judgment or the waiver issues until after the jury had rendered its verdict on liability and compensatory damages. In fact, the trial court did not actually rule on the waiver issue appellant asks us to address. The issue of whether appellant waived completion of the facility was first raised during a hearing on pre-trial motions and again during the hearing on appellant's motion for new trial, which was discussed immediately following the court's ruling on the summary judgment motion. Having failed to convince the court that it was entitled to summary judgment against Ellerin and Seidel because the facility had not been completed, Fairfax argued that it should be granted a new trial because "the issue of waiver is clearly one that had to go to the jury." In explaining his denial of Fairfax's motion for new trial, the trial judge commented:

Well, that assumes that it was an issue for the jury. There are factual questions that don't go to the jury in any kind of case.

You know, a red light case or a rear end case, when it would be unreasonable to send it to the jury it doesn't go to the jury. I have said, I guess often enough now, that under these circumstances—and I invited half a dozen times the presentation of evidence—that Fairfax hasn't treated this as completed. I invited you to put on whatever that fellow's name was that I was never able to pronounce to come in here and say that Mr. Seidel was wrong, that it hadn't been completed [sic] treated as completed, we have gone over the rollover and the release of the retainage.

So, that issue, in my opinion, is not one for the jury because the issue is one that there could be no question about how it should reasonably be inserted.

The court's ruling was a denial of appellant's motion for a new trial. The opinion that the waiver issue was for the court, rather than the jury, to decide, which formed the basis for the ruling on the motion, in and of itself is not appealable. *Administrator, Motor Vehicle Admin. v. Vogt,* 267 Md. 660, 299 A.2d 1 (1973). What might have been appealable and thus serve as a vehicle for appellant's complaint that the issue of waiver should have gone to the jury, was the court's denial of Fairfax's motion for new trial. Appellant, however, chose not to appeal that ruling, opting instead to appeal from a ruling that was never made.[11]

Appellant further contends that the trial court erred by impermissibly taking the issue of waiver from the jury and deciding it as a matter of law. Again, appellant fails to appeal the proper issue. During a hearing on pre-trial

---

11. On appeal a trial court's denial of a motion for new trial is reviewable only for abuse of discretion. *Dabrowski v. Dondalski,* 320 Md. 392, 394, 578 A.2d 211 (1990). *See Thodos v. Bland,* 75 Md.App. 700, 706, 542 A.2d 1307 (1988); *Martin v. Rossignol,* 226 Md. 363, 366–67, 174 A.2d 149 (1961).

motions the trial court made an *in limine* evidentiary ruling precluding Fairfax from presenting any evidence as to completion:

As far as the motion *in limine* with respect to completion, since it seems that there will be no evidence presented to this jury on the completion issue, I'm going to grant the motion with the understanding that you can ask my permission to introduce evidence about completion and I'll consider it at that time.

So, we won't have any completion evidence because there is no need for any. I can resolve that issue myself. If you feel, however, there is something that the jury should receive on that issue so they will get the full flavor of the transaction, all it is is a motion *in limine* and I can reconsider it.

The court went on to explain, in a dialogue with counsel, that it intended to grant a motion *in limine* regarding waiver completion testimony.

THE COURT: ... If I can't resolve them, then the jury should hear about it. What are the facts the jury is going to hear about? Two buildings weren't complete nonetheless they released all the money. That's a fact. That's it. There is no debate over that....

Now, does that operate as a waiver? I guess I'll decide that. I can decide it on the basis of evidence that nobody is contesting.... I just don't see it as a jury issue.... Again, I'll grant a motion *in limine.*

In its brief, appellant asserts that during the trial, but out of the jury's presence, it offered certain evidence relating to the waiver issue—evidence explaining its reasons for releasing the retainage without intending to waive its contractual right to demand that the facility be completed. The court, convinced that the proffered evidence was irrelevant to any issue to be decided by the jury, rejected the proffer.

Even if the ruling on the *in limine* motion, excluding evidence as to completion, might have been reviewable on appeal, *see Prout v. State,* 311 Md. 348, 353–54, 535 A.2d

445 (1988), neither that ruling nor the evidentiary ruling at trial, rejecting appellant's waiver-related proffer, are before us.

In this appeal, appellant does not attack, or assert as error, or present any argument about the court's rulings *in limine* or on the proffered evidence. The error complained of was an alleged ruling that the issue of waiver was for the court to decide as a matter of law and not for the jury to decide as a question of fact. But, as noted *supra,* the alleged erroneous ruling was not a ruling, merely an explanation for the actual ruling, denial of a motion for new trial.

 Appellant also asserts that the court erred in refusing to instruct the jury on the issue of waiver. While appellant did include instructions on waiver and completion in its jury prayers, it failed to preserve this issue by excepting specifically to the court's instructions. *Edmonds v. Murphy,* 83 Md.App. 133, 176, 573 A.2d 853 (1990). *See* Md.Rule 2–520(e).

## VI

## PUNITIVE DAMAGES

We now turn to Fairfax's argument concerning punitive damages. We are asked to determine what standard of malice must be shown to warrant recovery of punitive damages and whether proof of fraud is, in and of itself, sufficient to support such an award.

 The decision of the Court of Appeals in *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), is instructive. After analyzing the historical purposes of punitive damages—deterrence and punishment—the Court abandoned the doctrine, first announced by it in *H & R Block Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), that, although implied malice would support an award of punitive damages for other torts, actual malice would be required in cases of torts arising from contract. *Zenobia* holds that a party seeking punitive damages in any non-

intentional tort action must show actual malice. 325 Md. at 460, 601 A.2d 633.

In determining that actual malice must be proven for recovery of punitive damages in a non-intentional tort case, the Court explicitly overruled *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972), which had allowed a plaintiff to recover punitive damages upon a showing of defendant's gross negligence—a "wanton or reckless disregard for human life." 267 Md. at 167, 297 A.2d at 731. The Court criticized the use of this gross negligence or implied malice standard, noting that its application had been over-broad and resulted in inconsistent verdicts in factually similar cases. *Zenobia*, 325 Md. at 459, 601 A.2d 633.

The rejection of implied malice as an appropriate standard for non-intentional torts and the abandonment of the "tort arising out of contract" doctrine ushered in a new era of punitive damages analysis. The recovery of punitive damages depends upon the egregious nature of defendant's conduct, *see, e.g., Schaefer v. Miller*, 322 Md. 297, 321, 587 A.2d 491, 503 (1991), thereby keeping in step with the articulated rationale of punitive damages—punishment and deterrence. While the Court of Appeals definitively established actual malice as the appropriate standard for non-intentional torts in *Zenobia*, the question of what standard is appropriate for such intentional torts as fraud remained unaddressed until this Court's opinion in *Homa v. Friendly Mobile Manor, Inc.*, 93 Md.App. 337, 612 A.2d 322 (1992), *cert. granted*, 329 Md. 168, 617 A.2d 1085 (1993). *See also Zenobia*, 325 Md. at 460 n. 21, 601 A.2d 633.

Writing for this Court in *Homa*, Judge Bishop focused the punitive damages analysis on the tort-feasor's conduct—fraud and breach of fiduciary duty. For making false statements and failing to disclose his own interests, Homa was found by the trial court to have committed fraud. Relying on *Aeropesca, Ltd. v. Butler Aviation Int'l, Inc.*, 44 Md.App. 610, 411 A.2d 1055 (1980) (requiring something more than merely fraudulent behavior to establish actual malice), Homa contended that fraud that is

motivated by greed and not by an intent or desire to injure the plaintiff cannot support an award of punitive damages. This Court rejected that rationale and held that "[i]ntent to injure need not accompany fraudulent conduct in order to meet the standard for actual malice most recently articulated in *Zenobia.*" *Homa,* 93 Md.App. at 356, 612 A.2d 322. We held that the trial court's finding of fraud was supported by Homa's breach of fiduciary duty and was so egregious as to constitute gross fraud. This gross fraud, composed of Homa's fraudulent actions and breach of fiduciary duty, supported a finding of "malice and wilfulness," which, in turn, justified the award of punitive damages. *Id.* at 357, 612 A.2d 322.

Implicit in this Court's ruling in *Homa* is the proposition that actual malice must be proven for recovery of punitive damages in an action for fraud, but actual malice need not involve an intent to injure if the fraud is gross or egregious.

Ellerin and Seidel argue that, despite the holdings of *Zenobia* and *Homa,* the trial court should employ the implied malice standard under *Testerman* and *Wedeman* because *Zenobia* was not decided at the time of trial and the issue of the malice instruction was not preserved. From our review of the record, however, we are satisfied that the issue was properly preserved by Fairfax's exception to the court's instructions on punitive damages. Appellant's counsel expressly excepted to the lack of an instruction on "the actual malice standard." Although *Zenobia* was not decided at the time of this trial, the Court of Appeals went to great lengths in that case to articulate with specificity the applicability of its decision. Because the purpose of punitive damages is to deter defendants, retroactive application of *Zenobia* best serves this purpose. 325 Md. at 471, 601 A.2d 633. For these reasons, appellees are required to meet the actual malice standard to recover punitive damages in their fraud suit.

We arrive now at a more difficult question: what exactly is required to prove actual malice in a suit for fraud? In answering this question, the formal definitions of fraud and actual malice prove troublesome. As explained by Judge Miller over one hundred twenty years ago, fraud itself defies defining:

The common law not only gives no definition of fraud, but perhaps wisely asserts as a principle that there shall be no definition of it, for, as it is the very nature and essence of fraud to elude all laws in fact, without appearing to break them in form, a technical definition of fraud, making everything come within the scope of its words before the law could deal with it as such, would be in effect telling to the craft precisely how to avoid the grasp of the law.

*McAleer v. Horsey*, 35 Md. 439, 452 (1872), *overruled by Virginia Dare Stores, Inc. v. Shuman*, 175 Md. 287, 1 A.2d 897 (1938).

█ Since *McAleer*, fraud has been broadly defined as "all acts, omissions, and concealment which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." Story, *Equity Jurisprudence* § 187 (6th ed. 1953); *see Green v. Lombard*, 28 Md.App. 1, 12, 343 A.2d 905 (1975). More specifically, fraud in Maryland requires proof of the following elements:

(1) the representation made by defendant was false;

(2) the falsity was known to defendant or the misrepresentation was made with such reckless disregard for the truth as to impute knowledge of the falsity;

(3) the misrepresentation was made with the purpose of defrauding plaintiff;

(4) plaintiff relied upon the misrepresentation and would not have done the thing from which the damages resulted if the representation had not been made; and

(5) plaintiff suffered damages resulting from the misrepresentation.

*See Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 300, 513 A.2d (1986); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534 (1982), *see also Wedeman v. City Chevrolet Co.*, 278 Md. 524, 532 n. 5, 366 A.2d 7 (1976), *overruled by Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), citing *James v. Goldberg*, 256 Md. 520, 528–29, 261 A.2d 753 (1970); *Suburban Properties Mgmt. v. Johnson*, 236 Md. 455, 460, 204 A.2d 326 (1964); *Lambert v. Smith*, 235 Md. 284, 287, 201 A.2d 491 (1964); *DiLeo v. Nugent*, 88 Md.App. 59, 75, 592 A.2d 1126, *cert. granted*, 325 Md. 18, 599 A.2d 90 (1991).

In *Zenobia*, the Court of Appeals redefined the manifestation of actual malice as conduct characterized by "evil motive, intent to injure, ill will, or fraud." *Zenobia*, 325 Md. at 460, 601 A.2d 633. Because that phrase tends to indicate that proof of fraud is equivalent to proof of actual malice, by virtue of its definition, we shall endeavor to explain why actual malice requires more than *mere* fraud.

We are limited in our ability to clarify this issue by the inherent ambiguities in the art of defining and the constructs of our language. Actual malice, as pointed out by the Court of Appeals in *Zenobia*, has numerous connotations and tends to resist definition. Commentaries have noted that many courts have circularly defined and intertwined the concepts of malice and fraud:

The first problem encountered here is that many jurisdictions include the word "fraud" in the general judicial or legislative definitions they have developed to describe the requisite egregious conduct which must be proved to support a punitive damage award. In such a jurisdiction, it may appear reasonable to assume that proof of the underlying action in misrepresentation ("fraud") also establishes the liability of the defendant for punitive damages. However, the majority of jurisdictions hold otherwise. (Citations omitted.)

2 Ghiardi and Kircher, *Punitive Damages Law and Practice*, § 19.19 p. 56 (1984). Maryland is a jurisdiction in which recovery of punitive damages requires additional proof.

Historically, Maryland has denied recovery of punitive damages in an action for fraud except where "the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfulness and calling for an extension of the doctrine." *Russell v. Stoops*, 106 Md. 138, 143–44, 66 A. 698 (1907). This rule has been reiterated and applied in a number of cases. *See Fowler v. Benton*, 245 Md. 540, 226 A.2d 556, *cert. denied*, 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967); *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985); *Crawford v. Mindel*, 57 Md.App. 111, 469 A.2d 454 (1984); *Loyola Fed. Sav. and Loan Ass'n v. Trenchcraft, Inc.*, 17 Md.App. 646, 303 A.2d 432 (1973).[12]

This rule comports with the punitive damage requirements in the majority of jurisdictions. *See e.g., BWX Electronics, Inc. v. Control Data Corp.*, 929 F.2d 707 (D.C.App.1991) (without proof of aggravating circumstances, fraud alone is insufficient to support an award of punitive damages); *Olsson v. A.O. Smith Harvestore Products, Inc.*, 656 F.Supp. 644 (S.D.Ind.1987) (punitive damages recovery requires some evidence of malice rather than evidence that is merely consistent with fraud); *Jordan v.*

---

**12.** As noted in *Schaefer v. Miller*, 322 Md. 297, 316 n. 2, 587 A.2d 491, some Maryland cases have indicated that the existence of fraud itself showed a sufficiently evil motive to support an award of punitive damages. The cases cited, however, were not fraud cases, and the language used simply added fraud to the list of elements—malice, ill will, evil intent, oppression—that, when entering into and forming part of the wrongful act, will support an award of punitive damages. Those cases do not hold that fraud by itself, independent of any other wrong of malicious character, will support an award of punitive damages.

*Sauve,* 219 Va. 448, 247 S.E.2d 739, 741 (1978) (punitive damages for an action in fraud may be recovered only if there is a direct or circumstantial showing of actual malice).

 Because *Testerman* and *Wedeman* fundamentally altered the malice standard analysis for fraud arising out of a contractual relationship, we now rely upon the rationale of *Zenobia* and pre-*Testerman* case law to support our conclusion that recovery of punitive damages in an action for fraud requires proof of actual malice. *Russell* held that something more than simple, garden variety fraud is necessary to support a punitive damages award—there must be a breach of fiduciary duty, or gross fraud, or other extraordinary or exceptional circumstances from which actual malice may be inferred. That concept, we believe, is still applicable, inasmuch as the Court in *Zenobia* expressly stated that it was not reconsidering or modifying "the legal principles concerning the type of conduct which will support an award of punitive damages in so-called intentional tort actions, *i.e.,* tort actions other than negligence and strict liability." 325 Md. at 460 n. 21, 601 A.2d 633.

In the instant case, the court instructed the jury with regard to the purpose and nature of punitive damages and the need to consider the financial condition of Fairfax, but failed to give any instruction on actual or implied malice. That failure constituted reversible error. Without sufficient guidance the jury was unable to arrive at a proper assessment for a punitive damage award.

## VII

## SUMMARY

Although we reject appellant's contentions that the court erred (1) in its ruling that certain testimony proffered by Fairfax was not proper rebuttal evidence, (2) in denying appellant's motion for summary judgment, and (3) in ruling as a matter of law that Fairfax had waived its right to insist upon completion of the project before the termination of the partners' contractual obligations, we have found reversible

error in the court's instructions to the jury with respect to punitive damages. Therefore, Fairfax is entitled to a new trial on the issue of punitive damages, at which trial it will be entitled to an instruction to the effect that conduct characterized by ill will, intent to injure, oppression, or evil motive, *i.e.*, such conduct as is meant by the term "actual malice," must be shown before punitive damages may be awarded.

ALL JUDGMENTS OTHER THAN FOR PUNITIVE DAMAGES AFFIRMED; JUDGMENT FOR PUNITIVE DAMAGES VACATED, AND CASE REMANDED FOR A NEW TRIAL ON THAT ISSUE.

COSTS TO BE PAID THREE–FOURTHS BY APPELLANT AND ONE–FOURTH BY APPELLEES.